2011 Ark. 461

**Ricky Ray ANDERSON, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 11–331.**

Supreme Court of Arkansas.

Nov. 3, 2011.

Woods, Snively, Atwell Law Firm, by: Nick Churchill, Fayetteville, for appellant.

Dustin McDaniel, Att'y Gen., by: Brad Newman, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice.

⎣Appellant Ricky Ray Anderson was convicted of capital murder and sentenced to a term of life imprisonment. On appeal, Anderson contends that the circuit court (1) erred in denying his motion for directed verdict because there was insufficient

evidence to support a conviction for capital murder; (2) erred in giving the jury an unconstitutional instruction that shifted the State's burden of proof to the defendant; (3) abused its discretion in allowing testimony that the victim was pregnant; (4) abused its discretion in admitting State's Exhibits 9–16, photographs of the crime scene; and (5) erred in denying his motion to suppress custodial statements he made before *Miranda* warnings were given. Because this is a criminal appeal in which a term of life imprisonment was imposed, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2011). We affirm.

The following facts are adduced from the testimony and evidence presented at trial. On the evening of June 26, 2009, Kay Ulmer had dinner with her daughter, Jill Ulmer. At about 5:00 p.m. that day, Anderson called Kay and told her that he was in Oklahoma City and on his way to a hospital because he had overdosed. Jill and Anderson had previously shared the Fayetteville apartment where Jill continued to live. At 10:32 p.m., Jill placed a 911 call and reported to the dispatcher that Anderson was in her apartment parking lot and that she had a protection order against him. The dispatcher remained on the line with Jill while officers were dispatched to the apartment. The call ended with a scream. The dispatcher called back Jill's number twice, but no one answered.

Officer Kenneth Willyard and Corporal Chris Scherrey were the first two police officers to arrive at the scene. From the parking lot, Willyard heard a scream and then saw an apartment door slam shut. Willyard and Scherrey raced up the stairs to the apartment. Both Willyard and Scherrey tried to kick in the apartment door; Scherrey also attempted to open the door with his shoulder. Neither of the officers was able to open the door. Very

loud screaming continued to come from inside the apartment. Willyard kicked the glass out of a window near the door and moved curtains and blinds out of the way so he could see inside the apartment. Willyard saw Anderson squatting or kneeling behind a couch, with only his head visible above the back of the couch. Willyard testified that Anderson appeared to be fighting with a woman. Scherrey pulled out his Taser and shot, aiming at Anderson's shoulder. Willyard had also pulled out his Taser and pointed it at Anderson when he saw Anderson raise a knife in his right hand and bring it down forcefully. Willyard then dropped his Taser, yelled "knife," drew his pistol, and fired. He said that he could not get a good shot at Anderson because he could see only a small portion of Anderson's head above the couch. Willyard testified that Anderson continued to make stabbing motions, while the woman continued to scream, so he decided to aim his pistol at the area of the couch where he believed Anderson to be. Scherrey testified that he also fired his pistol at Anderson and aimed at Anderson's shoulder and head. After several shots were fired, the screaming stopped. Scherrey cleared glass from the window, crawled into the apartment, and opened the front door for Willyard. Willyard walked toward the couch and saw a woman, later identified as Jill Ulmer, lying on the floor. Anderson was taken into custody, handcuffed, and walked out of the apartment. Willyard checked on Jill and was unable to find a pulse.

Anderson contends that the circuit court erred in denying his motion for directed verdict because the State failed to present sufficient evidence to support a conviction for capital murder. On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *E.g., Camp v. State*, 2011 Ark. 155,

381 S.W.3d 11. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.* "A person commits capital murder if [w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark.Code Ann. § 5–10–101(a)(4) (Supp.2007).

At trial, Dr. Adam Craig, an associate medical examiner with the Arkansas State Crime Lab, testified that during the autopsy he performed, he found 27 stab wounds to Jill's body ⎣₄and a gunshot wound to her head. Among the wounds Jill suffered was a cut to her common iliac artery and vein. Dr. Craig testified that the common iliac artery is a "high pressure blood vessel" that squirts blood when cut. Dr. Craig explained that the vessel comes directly off of the aorta and that it bleeds "really quickly" when cut. He testified that, because the vessel is so deep in the abdominal cavity, medical personnel and a surgical team would be required to open the abdomen and repair the cut. According to Dr. Craig, it would be "impossible" to treat the cut "in the field." Further, he stated that, in his opinion, a person with a cut common iliac artery would survive "probably less than five minutes" unless a surgical team was present to provide treatment. On cross-examination, he testified that it would be "stretching it" to say that it was possible that someone suffering from a cut common iliac artery could live for ten minutes. Dr. Craig also testified that doing things such as changing the position of Jill's body or using anti-shock

trousers would have had little effect on stopping the bleeding. He stated that, even if someone trained in treating abdominal wounds had been present at the crime scene, Jill would not have survived without surgery. Dr. Craig testified that, while Jill's death was caused by a gunshot wound to the head, it was his opinion that Jill would have also died as a result of the wound to her common iliac artery.

Anderson states that the immediate cause of Jill's death was a bullet that was fired by a police officer. He contends that the State failed to present substantial evidence to compel the conclusion that his conduct was clearly sufficient to cause the death of Jill, as is required by Arkansas Code Annotated section 5–2–205 (Repl. 2006). He claims that the jury had to speculate as to what would have happened had a bullet not struck Jill in the head and killed ⎣₅her.

▪ Our law is well settled that, where there are concurrent causes of death, conduct which hastens or contributes to a person's death is a cause of death. *E.g., Jefferson v. State,* 372 Ark. 307, 276 S.W.3d 214 (2008). Causation may be found when the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient to produce the result. Ark.Code Ann. § 5–2–205.

In this case, Anderson's stabbing of Jill brought about the officers' use of deadly force that killed Jill. Had Anderson not been stabbing Jill, the officers would not have attempted to end Anderson's attack on Jill by using deadly force. The concurrent cause—the gunshot wound—was clearly sufficient to cause Jill's death, but

Anderson's conduct—stabbing Jill—was not clearly insufficient to cause Jill's death. Dr. Craig testified that it was his belief that Jill would not have survived the wound to her common iliac artery. He testified that he formed his opinion based on his medical knowledge regarding the volume of blood in the body, the typical blood pressure in the arteries and veins, and other cases "where similar arteries had been cut and they knew how long it took them to bleed to death."

Ultimately, the resolution of Anderson's causation challenge rests on the credibility of Dr. Craig's testimony that Jill would have died from the wound to her common iliac artery. The weight given to the evidence, even expert testimony, is a matter for the jury. *E.g., Jackson v. State,* 2009 Ark. 336, 321 S.W.3d 260. It was for the jury to determine whether, as Dr. Craig testified, Jill would not have survived the cut to her common iliac artery. *See, e.g., Windsor v. State,* 338 Ark. 649, 1 S.W.3d 20 (1999) (stating that where the medical examiner testifies that any of multiple injuries alone could have caused the victim's death, it was for the jury to decide the cause of the victim's death). The circuit court did not err in denying Anderson's motion for directed verdict.[1]

Anderson next contends that AMI Crim.2d 603, the causation instruction given by the circuit court,[2] unconstitutionally shifted the burden of proof to the defendant by requiring him to show that his actions were "clearly insufficient" to cause the victim's death. The State contends that Anderson's argument is not preserved for appellate review. The State is correct.

Before the court instructed the jury during the guilt phase of the trial, Anderson objected to the causation instruction on the basis that it applies only to cases involving felony murder, and not to premeditated and deliberated murder. The circuit court overruled the objection, and Anderson made no further challenge to the instruction. On appeal, however, Anderson abandons the argument he made at trial and instead asserts his burden-shifting argument.

The general rule is that this court does not consider arguments, even constitutional ones, raised for the first time on appeal. *E.g., Davis v. State,* 2009 Ark. 478, 348 S.W.3d 553. Even in a case in which a sentence of life imprisonment has been imposed, the appellant is bound by the scope of the argument he or she made at the trial level. *Id.*

Anderson concedes that he did not raise his constitutional argument to the circuit court. Nevertheless, citing *Sasser v. State,* 338 Ark. 375, 993 S.W.2d 901 (1999), Anderson contends that he may raise his argument for the first time on appeal because the burden-shifting instruction read to the jury constituted an error that was so fundamental as to render the judgment of conviction void and subject to collateral attack. *Sasser* was a postconviction case

---

1. Anderson also argued in his directed-verdict motion that the State failed to prove that he acted with premeditation and deliberation. But he does not continue this argument on appeal. Issues raised below but not argued on appeal are considered abandoned. *E.g., Jordan v. State,* 356 Ark. 248, 147 S.W.3d 691 (2004).

2. The circuit court instructed the jury as follows:

In these instructions, you will be told that the State must prove that Ricky Anderson caused a particular result. Causation exists when the result would not have occurred except for the conduct of Ricky Anderson operating either alone or together with another cause unless the other cause was clearly sufficient to produce the result and the conduct of Ricky Anderson was clearly insufficient by itself.

and does not provide a basis for raising an argument for the first time on *appeal*. Rather, *Sasser* explains when a judgment is subject to *collateral attack* in a postconviction proceeding.

Other than addressing the narrowly defined exceptions to our contemporaneous-objection rule outlined in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), we do not follow the plain-error doctrine whereby appellate courts address plain errors affecting substantial rights that were not brought to the attention of the trial court. *Harris v. State*, 363 Ark. 502, 215 S.W.3d 666 (2005). Anderson does not make an argument for application of a *Wicks* exception that would permit this court to address the issue for the first time on appeal. *E.g., Adams v. State*, 2009 Ark. 375, 326 S.W.3d 764. Accordingly, we decline to address the merits of his argument.

Anderson next contends that the circuit court abused its discretion in admitting evidence that the victim was pregnant. He filed a pretrial motion in limine to exclude evidence that Jill was pregnant and claimed that the issue of whether Jill was pregnant at the time of her death was irrelevant and more prejudicial than probative. At the hearing on the motion, the State contended that Jill's pregnancy was a possible motive for the murder and noted that of the 27 stab wounds Jill suffered, 13 of them were in the area of her abdomen. The circuit court took the motion under advisement; subsequently, the circuit court ruled that the evidence of Jill's pregnancy was admissible because it could show Anderson's motive and intent.

Anderson claims that evidence concerning Jill's pregnancy was irrelevant. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less proba-ble than it would be without the evidence." Ark. R. Evid. 401 (2011). A circuit court's ruling on relevancy will not be disturbed absent an abuse of discretion. *E.g., Banks v. State*, 2010 Ark. 108, 366 S.W.3d 341.

Part of the State's theory of the case was that Anderson killed Jill because she was pregnant with his child. When the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the act may, as a rule, be shown. *E.g., Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996). As such, we hold that the circuit court did not abuse its discretion in admitting the evidence of Jill's pregnancy.

Because it is not preserved for our review, we do not address Anderson's assertion that, even if evidence of Jill's pregnancy was relevant, the danger of unfair prejudice far outweighed any probative value the evidence might have had. To preserve a point for appellate review, a party must obtain a ruling from the circuit court. *E.g., Alexander v. State*, 335 Ark. 131, 983 S.W.2d 110 (1998). Here, Anderson failed to obtain a ruling regarding whether the pregnancy evidence was more prejudicial than probative. The burden of obtaining a ruling on an objection or motion is upon the movant, and the failure to secure a ruling constitutes a waiver, precluding its consideration on appeal. *E.g., Walker v. State*, 301 Ark. 218, 783 S.W.2d 44 (1990).

Anderson next asserts that the circuit court abused its discretion in admitting eight photographs taken at the crime scene because they were substantially more prejudicial than probative. He also asserts that the photographs do not accurately reflect the scene as it was discovered by the police. We have held that the admission of photographs is a matter left

to the sound discretion of the circuit court, and we will not reverse absent an abuse of that discretion. *Robertson v. State*, 2011 Ark. 196, 2011 WL 1688317. When photographs are helpful to explain testimony, they are ordinarily admissible. *Id.* The mere fact that a photograph is inflammatory or cumulative is not, standing alone, sufficient reason to exclude it. *Id.* Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: (1) by shedding light on some issue; (2) by proving a necessary element of the case; (3) by enabling a witness to testify more effectively; (4) by corroborating testimony; or (5) by enabling jurors to better understand the testimony. *Id.* Other acceptable purposes include showing the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered. *Id.*

Before trial, Anderson filed a motion in limine to exclude the introduction of crime-scene photographs and a motion to suppress crime-scene photographs. As previously noted, Jill died shortly after she called 911 at 10:32 p.m. on June 26 to report that Anderson was in her apartment parking lot, and the crime scene was secured that night. The search warrant was executed the next morning, some eight or nine hours after Jill's death, and a crime-scene investigator took the photographs at issue, State's Exhibits 9–16. At the hearing on the motions, Anderson argued that, because those photographs were taken eight to nine hours after the victim's death, they did not accurately reflect the scene as the police discovered it. The prosecutor responded that what was depicted in State's Exhibits 9–16 was caused by Anderson's conduct and that the only difference between those photographs and photographs taken a few minutes after Jill's death was that "some blood in the later photographs [had] separated over

time because the police had to wait to serve the search warrant." The circuit court withheld ruling on the issue until it heard at trial why the photographs were being introduced.

At trial, Sergeant Carey Hartsfield was shown State's Exhibits 9–16, and he testified that the photographs appeared to accurately reflect what he saw at the crime scene when he arrived there shortly after Jill's death. Hartsfield further testified that the photographs were taken eight to nine hours after Jill died and that they showed more blood than the photographs he took shortly after the murder occurred. Hartsfield stated that Jill's body appeared to be in the same position in State's Exhibits 9–16 as it was in the photographs taken shortly after Jill died. The State moved to introduce the photographs, and defense counsel for Anderson renewed his objection, stating,

> Your Honor, we would object to 9 through 16. We don't believe they're relevant. There are pictures of the victim that were taken at the time of the incident. I believe as Detective Brooks has described these were taken over eight to nine hours later. There is a lot more blood, a lot more gore, and under 403 would be much more prejudicial than it would be probative.

The circuit court ruled that the photographs were "sufficiently relevant" to be admitted and noted that the jury was "aware of when they were taken."

We hold that the circuit court did not abuse its discretion in admitting State's Exhibits 9–16. All of the photographs at issue enabled the jurors to better understand testimony about the crime scene. Moreover, the jury heard testimony from Hartsfield that State's Exhibits 9–16 were taken at the crime scene eight to nine hours after Jill's death and that they

showed more blood than the photographs that were taken shortly after the murder occurred. We do not address Anderson's argument that the circuit court abused its discretion in admitting the photographs because they were substantially more prejudicial than probative. Anderson failed to obtain a ruling from the circuit court on this issue. Without a ruling, we have nothing to review on appeal. *E.g., Terry v. State*, 309 Ark. 64, 826 S.W.2d 817 (1992).

Anderson next contends that the circuit court erred in denying his motion to suppress statements he made before he was given the *Miranda* warnings. He claims that the statements were involuntary and a product of police officers' deliberate disregard of his constitutional rights. The State contends that the circuit correctly denied Anderson's motion to suppress because even though Anderson made the statements while in custody, he did not do so in response to interrogation; rather, he spoke spontaneously.

When this court reviews a circuit court's ruling on a motion to suppress statements, we make an independent determination based on the totality of the circumstances. *E.g., Marcyniuk v. State*, 2010 Ark. 257, 373 S.W.3d 243. We will reverse the circuit court's ruling only if it is clearly against the preponderance of the evidence. *E.g., Davis v. State*, 367 Ark. 330, 240 S.W.3d 115 (2006). The circuit court determines the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding a defendant's custodial statements, and this court defers to the circuit court in matters of credibility. *E.g., Davis v. State*, 318 Ark. 212, 885 S.W.2d 292 (1994).

Anderson filed a pretrial motion to suppress statements he made to the police while in custody. At the hearing on that motion, Willyard testified that Anderson was taken into custody inside Jill's apartment and handcuffed there by Scherrey. Willyard stated that he did not Mirandize Anderson or see any other law-enforcement officer do so. Willyard also stated that he did not question Anderson at the crime scene and that he did not observe any other law-enforcement officer question Anderson.

Officer Nickalus White, a patrolman for the Fayetteville Police Department, testified that when he arrived at Jill's apartment complex at approximately 10:44 p.m. on June 26, he saw Willyard and another officer walking a handcuffed Anderson down the steps. White assisted in conducting a search of Anderson's person and said that he did not ask Anderson any questions until Anderson volunteered that a man named Greg[3] was at the crime scene and had been shot twice. White said that he then spoke to Anderson about Greg in an attempt to figure out where Greg was so police officers could check on his welfare. White stated that Anderson also told the officers that his shoulder hurt but that when EMS personnel examined Anderson, they found no injury. White testified that he never read Anderson the *Miranda* warnings because he had no intention of interviewing him. He said that he drove Anderson to the police department and waited with him there until detectives arrived.

White testified that the camera and audio recording system (MVR) was working in his patrol car when he drove Anderson to the police station. White also wore a microphone that was on the entire time he was with Anderson. White testified that he and Anderson left the crime scene at 11:00 p.m. and that detectives arrived at

---

3. White testified that no such person was ever found.

the police station to interview Anderson around midnight. White asked Detective Brooks if he could turn on the audio-visual equipment in the interview room because Anderson was making statements. White said that he told Brooks that Anderson had not been Mirandized. White testified that he told Anderson they could talk about anything other than the events of that night and that Anderson voluntarily replied that Jill was his fiancée and was pregnant with his baby.

White testified that, at the police station, Anderson told him he had gone to Jill's apartment to help her get her television back from Greg, that Greg was already there, and that Greg rushed inside the apartment and pulled Jill inside. White said that Anderson then told him he went inside the apartment, locked the door, and turned his back to Greg and Jill until the police arrived.

White stated that, at some point, he made a phone call to Sergeant Key to tell him that Anderson claimed that someone had been in the apartment. White said that Key asked him if he was "hot," that is, if his microphone was recording what Anderson was saying. White testified that Key asked about the microphone because he wanted to make sure that Anderson's voluntary statements were being recorded.

Fayetteville Police Department Sergeant Paul Shepard testified that he saw Anderson in the interview room shortly after midnight. He said that after he collected Anderson's clothing for testing and swabbed Anderson's hands, he read Anderson his *Miranda* rights. At 12:15 a.m., Anderson signed a form stating that he understood his rights. Shepard testified that he did not question Anderson before reading him his rights. He also

testified that once he began to question Anderson, Anderson said, "I'm not making no statement without no lawyer." Shepard said that, because Anderson had invoked his right to counsel, he did not question Anderson any further but that Anderson repeatedly asked him whether Jill was dead. Shepard said that he left the interview room at 12:35 a.m. and returned at 3:07 a.m. because Anderson had been knocking on the door. Shepard said that when he opened the door, Anderson asked him if he could call his lawyer. Shepard said that he told Anderson he could call his lawyer "in a little while" and that he told Anderson he could not speak to him because he had asked for his lawyer. Shepard testified that after he got Anderson some water, Anderson asked him if he could call his wife, and he told Anderson that his wife was at the police station. Shepard stated that Anderson told him his wife "didn't have anything to do with it" and that Anderson "admitted being over there." *Id.*

Shepard testified that, when he read Anderson his *Miranda* rights, he did not appear to be confused or incapable of understanding his rights. He stated that Anderson was monitored via video while he was alone in the interview room because he was in custody and not in handcuffs. At the conclusion of the testimony at the suppression hearing, the State introduced records of Anderson's prior convictions as proof of his familiarity with the criminal-justice system. At a later hearing, the circuit court denied Anderson's motion to suppress, finding that with one exception,[4] Anderson's custodial statements were voluntary and not the result of any interrogation.

4. The circuit court suppressed Anderson's response when White told him "[y]ou can describe it to me."

After reviewing the totality of the circumstances, we hold that the circuit court did not err in denying Anderson's motion to suppress. A suspect's spontaneous statement while in police custody is admissible, and it is irrelevant whether the statement was made before or after *Miranda* warnings because a spontaneous statement is not compelled or the result of coercion under the Fifth Amendment's privilege against self-incrimination. *E.g., Sweet v. State*, 2011 Ark. 20, 370 S.W.3d 510. In determining whether a defendant's custodial statement was spontaneous, we focus on whether it was made in the context of a police interrogation, meaning direct or indirect questioning put to the defendant by the police with the purpose of eliciting a statement from the defendant. *E.g., Stone v. State*, 321 Ark. 46, 900 S.W.2d 515 (1995).

We conclude that Anderson's statements were spontaneous. Anderson made numerous statements to police officers, but those statements, except for the one suppressed by the circuit court, were not made in the context of a police interrogation. We are not persuaded by Anderson's claim that his statements were the product of police officers' "subtle" interrogation. The State points out that Anderson had a propensity to talk. Officer White described Anderson as having "diarrhea of the mouth," stating that even though he told Anderson they could not talk about what had happened that night, Anderson continued to make voluntary statements regarding the events of that night. At the suppression hearing, White testified that the only time he questioned Anderson was when he was attempting to locate Greg, the man who Anderson said had been shot at the apartment. Anderson responded to White's query. But a voluntary custodial statement does not become the product of a custodial interrogation simply because an officer asks a defendant to explain or clari-fy something he or she already said voluntarily. *E.g., Stone, supra.*

Anderson contends that his statements were involuntary because evidence he presented at trial showed that his IQ was 76. The State responds that Anderson's argument is not preserved for our review. The State is correct. The issue of Anderson's IQ was not before the circuit court when it considered and denied the suppression motion before trial. Anderson never developed this issue before the circuit court, nor did he obtain a ruling on the issue; accordingly, it is not preserved for our review. *E.g., Eastin v. State*, 370 Ark. 10, 257 S.W.3d 58 (2007).

Finally, we are not persuaded by Anderson's argument that his statements should have been suppressed due to the length of his detention, his vulnerability at the time he made the statements, and the "lack of advice" about his constitutional rights. Anderson's statements were spontaneous and not the product of police interrogation. The circuit court did not err in denying Anderson's motion to suppress.

The record in this case has been examined for reversible error in accordance with Arkansas Supreme Court Rule 4–3(i) (2011) and none has been found.

Affirmed.