SLIP OPINION

Cite as 2014 Ark. 500

# SUPREME COURT OF ARKANSAS

No. CR-13–872

| | |
|---|---|
| DON AIRSMAN, JR.<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered** December 4, 2014<br><br>APPEAL FROM THE HEMPSTEAD COUNTY CIRCUIT COURT [NO. CR–2012-161-1]<br><br>HONORABLE RANDY WRIGHT, JUDGE<br><br>AFFIRMED. |

**PAUL E. DANIELSON, Associate Justice**

Appellant Don Airsman, Jr., appeals from the sentencing order of the Hempstead County Circuit Court reflecting his conviction for first-degree murder and his sentence to life imprisonment, plus a fifteen-year enhancement for use of a firearm. He asserts three points on appeal: (1) that there was insufficient evidence to support his conviction for first-degree murder; (2) that the circuit court erred in denying his motion to suppress his statements; and (3) that the circuit court erred in denying his motion in limine to exclude certain photographs. We affirm Airsman's convictions and sentence.

On April 27, 2012, the Hempstead County Sheriff's Office received a report from the Bowie County Sheriff's Office that the burnt vehicle of William Allen Jones, Jr., had been found in Bowie County, Texas. Deputy James Braddock was dispatched to Jones's residence

SLIP OPINION

in Saratoga, Arkansas, for a welfare check around 10:45 p.m. that evening; however, he was unable to make contact with anyone at the home.

The next morning, Jones's daughter, Kristi Dellinger, was contacted by Jones's girlfriend, Karla Denton, who told Dellinger that Jones had not shown up for plans that they had made together for the night before. Dellinger then tried to contact Airsman, her stepbrother and Jones's stepson, to see if he knew of Jones's whereabouts. At trial, Dellinger testified that Airsman told her that her father had been at Airsman's home the night before, had picked up a few things, had checked his mail, and then left a little before 8:00 p.m. She further testified that Airsman told her that he himself had left the home at 9:00 p.m. and went to Missouri.

After Dellinger spoke with Airsman, she contacted family members who searched the areas in which they believed that Jones would have traveled the evening before. Dellinger also went to Jones's home in which Airsman lived, although Jones was not living in the home at the time. When she did not find Jones, she contacted law enforcement officials who were dispatched to the home. When officers arrived, Dellinger informed them that Jones had been scared of Airsman and had sought protection from him. While Investigator Justin Crane of the sheriff's office was talking with Dellinger, he noticed partial, bloody shoe prints on the porch of the home, as well as large amounts of blood on the side of the driveway. At that time, he contacted his captain, Frank McJunkins.

The same day, around 1:30 p.m., Officer Bill Landers with the Bowie County Sheriff's Office returned a phone call from Captain McJunkins, who asked him to look at Jones's

vehicle again, in light of the missing-person report and crime scene at the Saratoga home. Officer Landers did so, and he discovered a body in the back of the vehicle. Also located inside the Honda Fit vehicle were ammunition and a gun, as well as burned clothing.

After learning of a protective order that Jones had sought against Airsman but was not served, and armed with the knowledge that Airsman had claimed to have seen Jones the night before, Airsman was developed as a suspect and believed to be the last person to have seen Jones alive. A "be on the lookout" ("BOLO"), was issued, stating that Airsman was wanted for questioning, should be held and detained, and could possibly be in the Jonesboro area or en route to Dunklin County, Missouri, where his father resided. The sheriff in Dunklin County was contacted to ensure receipt of the BOLO, which was confirmed.

Upon receipt of the BOLO, the Dunklin County Sheriff's Office located Airsman at his father's home, arrested him, and took him into custody. A warrant for his arrest was subsequently applied for and received by Arkansas law enforcement, and Captain McJunkins and some other officers flew to Dunklin County. On their arrival, Captain McJunkins and Hays McWhirter, Criminal Investigator for the Arkansas State Police, interviewed Airsman. Airsman was Mirandized and completed a *Miranda* form waiving his rights.

During the videotaped interview ("the Missouri statement"), which was admitted at trial, Airsman told the officers that, two days before, he had been in Saratoga with his father, who had been visiting him. Airsman said that he had left the night before the interview at 9:00 p.m. and driven to Dunklin County, following his father. Airsman told the officers that the last time he had seen Jones was before he had left Saratoga. Airsman told them that, while

3

Jones no longer stayed at the home that he had shared with Airsman's mother, who had passed away, Jones came to the home around 4:00 or 4:30 p.m. and "walked around the place . . . picked up a few things out of the house and talked for awhile." Airsman then told the officers that Jones had left the home shortly before 8:00 p.m.

After being told that Jones's car had been found, Airsman "deduced" that Jones was dead, and he denied shooting Jones and further denied that his father had done so. In addition, he denied taking Jones's car to Texas and setting fire to it, and he denied having any knowledge of blood being in the driveway or the house. The officers told Airsman that he had been arrested on a probable-cause affidavit and, at that point, Airsman again claimed his innocence and announced that he wanted to speak to his attorney.

Airsman waived extradition, and he was brought back to Hempstead County on May 2. After being booked, Airsman requested to speak with Captain McJunkins. He was again Mirandized and waived his rights. In his statement to Captain McJunkins ("the Arkansas statement"), Airsman admitted shooting Jones, claiming that he did so after Jones had pulled a gun on him and then directed it toward Airsman's father. An information was subsequently filed, charging Airsman with first-degree murder and noting the State's contention that Airsman should receive an enhanced sentence for employing a firearm.

Following the circuit court's denial of Airsman's motion to suppress his statements, he was tried by a jury, convicted of first-degree murder, and sentenced to a total term of life imprisonment plus fifteen years for the firearm enhancement. Airsman now appeals.

SLIP OPINION

I. *Sufficiency of the Evidence*

As his first point on appeal, Airsman argues that there was insufficient evidence to support his conviction for first-degree murder. He contends that the evidence presented actually supported his position that the homicide was committed in self-defense. Specifically, he points to his immediate flight to Missouri, the fact that Jones's body had been burned, and the testimony by a forensic psychologist as evidence in support of his "self-defense followed by a mental break resulting from . . . post-traumatic stress disorder . . . caused by his military service." Airsman claims that because the evidence supported his justification defense, it was insufficient to sustain his conviction for first-degree murder. The State counters Airsman's contention, maintaining that there was substantial evidence to show that Airsman was not justified in shooting Jones.

This court treats a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Loggins v. State*, 2010 Ark. 414, 372 S.W.3d 785. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *See id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *See id.*

When a criminal defendant challenges on appeal the sufficiency of the evidence convicting him, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *See id.* Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and

SLIP OPINION

inconsistent with any other reasonable conclusion. *See id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *See id.*

Airsman was convicted of first-degree murder, pursuant to Arkansas Code Annotated § 5-10-102(a)(2), which provides in relevant part:

> (a) A person commits murder in the first degree if:
> . . .
> (2) With a purpose of causing the death of another person, the person causes the death of another person.

Ark. Code Ann. § 5-10-102(a)(2) (Repl. 2013). A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. *See* Ark. Code Ann. § 5-2-202(1) (Repl. 2013). A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *See Davis v. State*, 2009 Ark. 478, 348 S.W.3d 553. Thus, this court has recognized that the intent necessary for first-degree murder may be inferred from the type of weapon used, from the manner of its use, and the nature, extent, and location of the wounds. *See Copeland v. State*, 343 Ark. 327, 37 S.W.3d 567 (2001). Here, Airsman does not dispute that he shot and killed Jones. Rather, he contends, he did so because he feared for his father's life when Jones brandished a gun and turned in his father's direction.

The following testimony was elicited at trial. Chief Deputy Mickey Atkinson of the Hempstead County Sheriff's Office testified that, prior to Jones's death, he had spoken with Jones on two separate occasions, once in February 2012 and again in March of that same year.

On both occasions, he said, Jones expressed concern about his safety because he feared Airsman and wished to have Airsman removed from his home. Mandy Turner, the Hempstead County Coordinator for Domestic Violence Prevention, also testified that she visited with Jones in late March 2012. She stated that Jones began the paperwork required for a protective order against Airsman, but decided not to file it because he had hoped that Airsman would leave the home on his own. She further testified that on April 24, 2012, Jones had changed his mind because he continued to fear for his life, and they filed for the protective order on April 26.[1] The next day, Jones called Turner's office to see if the order had been served on Airsman, stating that he needed to check his mail at his home and believed his life was in danger.

Karla Denton, who began seeing Jones after the death of his wife, Airsman's mother, testified that Jones began staying at her home because he feared staying in his own. She stated that Jones had told her that he was afraid of Airsman and afraid for his life. Denton also testified that Jones bought a .380 firearm because he was scared of Airsman. Like Denton, Kristi Dellinger, Jones's daughter, testified that Jones had expressed his fear of Airsman and that he had purchased a gun for his protection. Dellinger testified that after she was notified by Denton that her father was missing, she called Airsman to see if he had any knowledge of her father's whereabouts. She stated that Airsman told her that her father had been at his

---

[1]The record reflects Turner's testimony that she delivered the protective order to the sheriff's office, but that upon its receipt, there was no record of effort by the sheriff's office to serve the order on Airsman.

home the night before, but had picked up some things, checked his mail, and left before 8:00 p.m. She further testified that Airsman told her that he had left a little before 9:00 p.m. to go to Missouri.

Airsman's father, Donnie Edwin Airsman, Sr., testified that on the night of the shooting, Airsman, Jr., had told him that Jones might come by, and Airsman, Sr., asked his son if it would be a problem that he was at Jones's home. He said that Airsman, Jr., patted him on the shoulder, chuckled, and said, "[W]ell, I might have to kill him." While inside the workshop on the property, Airsman, Sr., heard a shot; he testified that he then ran outside and saw Airsman, Jr., shoot Jones two more times. He said that he had to tell his son to stop shooting. He also stated that there was a black automatic pistol on the ground close to Jones's hand.

Airsman, Sr., testified that after Jones fell to the ground, he died two or three minutes later. He stated that Airsman, Jr., then wrapped Jones's body with a blanket he retrieved from the house and put Jones's body in Jones's car. According to Airsman, Sr., Airsman, Jr., directed his father to leave his cell phone in the truck at the house and to follow him "in a little while." Airsman, Sr., testified that his son then washed the blood from the driveway using a water hose and picked up the shell casings.

Airsman, Sr., further testified that, after cleaning up, Airsman, Jr., drove Jones's car with Jones's body in the back, about thirty to forty-five minutes out of town, when Airsman, Jr., stopped the car on the side of the road, left it, and got into Airsman, Sr.'s car. After that, he said, they returned to the home in Saratoga, where Airsman, Jr., put some of his mother's

things into his truck, and they followed each other to Missouri. Airsman, Sr., acknowledged that they did not call law enforcement or emergency responders after the shooting.

In addition to the foregoing, the jury heard both of Airsman's statements to police, including the Arkansas statement in which he admitted shooting Jones. Airsman stated that when Jones arrived at his home, Jones told Airsman that he should have already been out of the house and pulled a gun, which he held towards Airsman's face. Airsman told the officers that his father exited the shop, at which point Jones turned with the gun in his father's direction. Airsman stated that it was at this time that he shot Jones with a gun he kept in his pocket. He further admitted shooting Jones several times and loading Jones's body into the back of Jones's car, as well as Jones's glasses, hat, and gun. Airsman stated that he drove the car, eventually abandoning it, and was picked up by his father. Airsman told the officers that when he went back into his house, he changed his clothes, placed the ones with blood on them in a bag, and threw that bag out of his car on his way to Missouri. Airsman also told police about the calls he received from Jones's daughter asking if he knew where Jones was. He admitted that when he received those calls, he "started freaking out."

The jury further heard the testimony of Jennifer Whitmore, a psychologist formerly at the Arkansas State Hospital. She testified that following her examination of Airsman, she diagnosed him with posttraumatic stress disorder and personality disorder, neither of which, she said, was considered a mental disease or defect under Arkansas law. She stated that it was her opinion that at the time of the offense, Airsman had the capacity to conform his conduct

to the law. She also stated that, based on the information she received from Airsman himself, he had problems with hostility and anger.

Dr. Whitmore believed that Airsman had told her that his duties during his military service "consisted of piling up bodies and burning them" and acknowledged that such activity had a bearing or effect on his suffering from posttraumatic stress. She further said that even if his behavior after the shooting could be indicative of his posttraumatic stress disorder, that behavior could also be an indication of his attempts to cover up the crime and avoid detection. In his defense, the jury also heard from Charlie Airsman, Airsman's brother; his brother stated that while at their mother's funeral, he heard Jones ask Airsman to stay at his house in Saratoga with him because Jones did not want to live in the house alone.

The instant record reflects that the jury found Airsman guilty of first-degree murder, despite also being instructed on second-degree murder and manslaughter and being given the justification instruction. Clearly, the jury disbelieved Airsman's defense of justification, which it was free to do. It is well settled that the credibility of witnesses is an issue for the jury and not this court. *See Brunson v. State*, 368 Ark. 313, 245 S.W.3d 132 (2006). Furthermore, the jury is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *See id.* In doing so, the jury may choose to believe the State's account of the facts rather than the defendant's. *See id.*

But, in addition, the jury was free to consider Airsman's lies to law enforcement officials and his changing stories about his knowledge of Jones's whereabouts. *See, e.g.*, *Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (2003). Furthermore, the jury could have

10

considered the fact that Airsman burned Jones's body and his car in an attempt to cover up his involvement in the crime. *See id.* We have held that such proof is further evidence of a purposeful state of mind. *See id.*

In sum, the fact that the jury chose not to believe Airsman's justification defense does not lessen the substantial nature of the evidence. "One who asserts the defense of justification of a homicide must show not only that the person killed was using deadly physical force, but that he responded with only that force which was necessary and that he could not have avoided the killing." *Williams v. State*, 325 Ark. 432, 438, 930 S.W.2d 297, 300 (1996); *see also* Ark. Code Ann. § 5-2-607 (Repl. 2013). The jury was instructed accordingly and rejected Airsman's defense, and its rejection is supported by the same evidence that supports the jury's finding that he acted purposely. *See, e.g.*, *Smith v. State*, 337 Ark. 239, 988 S.W.2d 492 (1999).

Having reviewed the evidence in the light most favorable to the State, we hold that there was substantial evidence to support Airsman's conviction for first-degree murder and that the circuit court did not err in denying his motion for directed verdict.

## II. *Motion to Suppress*

Airsman further argues that the circuit court erred in denying his motion to suppress his Missouri and Arkansas statements, where he invoked his right to counsel at the conclusion of the Missouri statement and the State failed to provide him with an attorney as he requested. While somewhat unclear, it appears that Airsman is also contending that had his arraignment not been unreasonably delayed and had he been provided counsel, he would not have

11

requested to speak with Captain McJunkins or given the Arkansas statement. The State counters that although Airsman invoked his right to counsel in Missouri, he initiated contact with Captain McJunkins upon his return to Arkansas. It further urges that any delay brought about by Airsman's own desire to give a statement cannot be considered unnecessary.

This court reviews a circuit court's decision denying a defendant's motion to suppress a confession by making an independent determination based on the totality of the circumstances, and the ruling will be reversed only if it is clearly against the preponderance of the evidence. *See Fritts v. State*, 2013 Ark. 505, 431 S.W.3d 227. The Fifth Amendment right to counsel attaches during custodial interrogation. *See Edwards v. Arizona*, 451 U.S. 477 (1981). When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *See id.* Instead, an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *See id.* While the accused may initiate further contact with the police, the impetus must come from the accused, not the police. *See Metcalf v. State*, 284 Ark. 223, 681 S.W.2d 344 (1984). Here, it is undisputed that Airsman invoked his right to counsel at the conclusion of the Missouri interview; therefore, the question presented is whether Airsman initiated further communication with Captain McJunkins prior to giving his Arkansas statement. The record makes clear that he did.

At the hearing on Airsman's suppression motion, Captain McJunkins testified that he saw Airsman while he was being booked upon his return to Arkansas. He stated that Airsman "kept telling me that he needed to talk to me real bad." Captain McJunkins testified that he told Airsman to complete a "request form," and he would see about talking with him. He denied initiating any communication with, or statement from, Airsman.

Captain McJunkins testified that Airsman completed the request form around 2:00 p.m., and it was brought to him by his lieutenant. He further testified that upon receiving the request, he set up another interview, Mirandized Airsman again, and had Airsman initial the *Miranda* form to acknowledge his waiver. Lieutenant Steve Glover confirmed that, while Airsman was being booked, Airsman had stated to him that he wanted to see Captain McJunkins. Glover directed another officer to give Airsman a request form, which Airsman completed, stating that he wanted to talk with Captain McJunkins. Glover testified that he then took the form to Captain McJunkins. Included in the record is the Hempstead County Detention Facility Inmate Request Form dated May 2, 2012, which reflects completion by Airsman and states, "I request to talk to Capt. McJunkins." Viewing the totality of the circumstances, the circuit court did not err in denying Airsman's motion to suppress on this basis.

Nor do Airsman's contentions relating to an unnecessary delay have merit. Arkansas Rule of Criminal Procedure 8.1 (2013) provides that "[a]n arrested person who is not released by citation or by other lawful manner shall be taken before a judicial officer without unnecessary delay." This court has not adopted a specific time limit for measuring Rule 8.1

13

SLIP OPINION

violations. *See Landrum v. State*, 328 Ark. 361, 944 S.W.2d 101 (1997). Instead, in *Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987), we adopted a three-part test to determine when a statement should be excluded upon a violation of Rule 8.1: (1) the delay must be unnecessary; (2) the evidence must be prejudicial; and (3) the evidence must be reasonably related to the delay. We have held that the defendant has the burden of proving each prong of the *Duncan* test. *See Arnett v. State*, 342 Ark. 66, 27 S.W.3d 721 (2000).

The record reflects that Airsman was arrested in Missouri on Saturday, April 28, and he gave the Missouri statement that evening, at approximately 12:05 a.m., April 29. His extradition hearing in Missouri was held Tuesday, May 1, and upon receiving notification of his extradition that day, Arkansas law enforcement officers were dispatched to retrieve Airsman, and they brought him back the following day, Wednesday, May 2. On May 2, Airsman arrived back in Hempstead County at 12:52 p.m., he completed his request form to speak with Captain McJunkins at 2:00 p.m., and he completed the *Miranda* form and was interviewed by the captain at 3:01 p.m. Airsman received his first appearance on Thursday, May 3.

Looking to the three prongs of the *Duncan* test, it is clear that Airsman's statement given to Captain McJunkins on May 2, was prejudicial where he admitted shooting Jones. Notwithstanding the prejudicial nature of his statement, Airsman was also required to prove that the delay in his first appearance was unnecessary and that his statement was reasonably related to the delay. With respect to the necessity of the delay, Airsman contended to the circuit court that the delay in his first appearance was unnecessary because he could have

received his first appearance upon his arrival in Hempstead County on May 2, rather than the next day. Yet, almost immediately upon his return, Airsman himself requested to speak with Captain McJunkins, and the interview was conducted that same day. The delay on May 2 was the result of Airsman's own request; therefore, it was not an unreasonable delay occasioned by the State. *See Otis v. State*, 364 Ark. 151, 217 S.W.3d 839 (2005).

But, in addition, Airsman has failed to demonstrate that his statement was reasonably related to the delay. We have held that statements are reasonably related to a delay "if it reasonably appears the delay contributed to obtaining the confession." *Arnett*, 342 Ark. at 76, 27 S.W.3d at 726 (quoting *Britt v. State*, 334 Ark. 142, 155, 974 S.W.2d 436, 442 (1998)). To determine whether a statement obtained from the accused was reasonably related to the delay, this court will consider the following factors: (1) any proof that the delay was for the purpose of obtaining a confession; (2) the frequency of police interrogation; (3) whether the accused was held incommunicado; and (4) the passage of time. *See id.*

While Airsman makes much of the delay between his arrest on April 28 and his first appearance on May 3, the fact of the matter is that his extradition by the State of Missouri was not granted until May 1. Almost immediately upon his return to Arkansas the following day, as already noted, Airsman requested to speak with Captain McJunkins and gave his inculpatory Arkansas statement. As we have already concluded, any delay was caused by Airsman himself, which would belie the notion that any delay was for the purpose of

SLIP OPINION

obtaining a confession.[2] Accordingly, we affirm the circuit court's denial of Airsman's suppression motion.

### III. *Motion in Limine*

As his final point on appeal, Airsman claims that the circuit court erred in denying his motion in limine, which sought to preclude the State from introducing certain photographs that he claimed were irrelevant and more prejudicial than probative. He contends that because he did not dispute either the number of times Jones had been shot or the location of his wounds, the photographs that were ultimately admitted were unnecessary and served only to inflame the jury. The lack of probative value, he claims, was illustrated by the absence of any testimony regarding the entry wounds following the admission of the photos. In addition, as evidence of their inflammatory nature, Airsman points to the prosecutor's statement cautioning the jury that the photos were disturbing. The State responds that of the six photographs deemed admissible by the circuit court, only three were introduced into evidence by the State. All were necessary, the State avers, for purposes deemed acceptable by this court.

---

[2]In his brief, Airsman further contends that the State's failure to provide him with an attorney "after he invoked his right to counsel in the Missouri Statement provides reason for the trial court to have granted" his motion to suppress. Arkansas Rule of Criminal Procedure 8.2(a) (2014) provides that "[a]n accused's desire for, and ability to retain, counsel should be determined by a judicial officer before the first appearance, whenever practicable." However, Airsman cites no authority for his proposition, and this court does not consider arguments without convincing argument or citations to authority. *See MacKool v. State*, 2012 Ark. 287, 423 S.W.3d 28.

At trial, Joni McClain, Deputy Chief Medical Examiner in Dallas County, Texas, testified regarding the autopsy completed on Jones's body. She testified that the cause of death was multiple gunshot wounds and that the manner of death was homicide. She further testified that Jones's body had been burned after he had expired. In addition, McClain testified with respect to each of the three gunshot wounds he received, the location of each, and whether the bullet that caused each wound had exited Jones's body. It was after this testimony that the State sought to introduce photographs to corroborate McClain's testimony "so the jury can see where on the body the bullets went in." The circuit court, after conducting an evaluation in camera, rejected State's Exhibits 71–77 as unhelpful and highly prejudicial; nonetheless, the circuit court deemed admissible State's Exhibits 64–69 and 70:

> However, the Court's opinion is as to what Doctor McClain has testified to, unfortunately autopsies are made of bodies and the condition they're presented to the medical examiner and her testimony was just—in the photos in 64 through 69 are just for purposes of showing what her testimony—about the three bullet holes and they do show the body as it was received by the medical examiner. But her testimony was reflected only of what the gunshot wounds were. And again, it's unfortunate that we receive bodies in the condition they are in but her testimony is about the shot of the three bullet wounds to the body and the Court will [*sic*] 64 through 69 and an x-ray, State's Exhibit 70 to be presented and identified by Doctor McClain and upon that being admitted into evidence.

The State subsequently admitted into evidence exhibits 64, 66, and 68, each of which, McClain explained, depicted the entry of one of the three gunshot wounds.

We have held that the admission of photographs is a matter left to the sound discretion of the circuit court, and we will not reverse absent an abuse of that discretion. *See Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 214. When photographs are helpful to explain

testimony, they are ordinarily admissible. *See id.* The mere fact that a photograph is inflammatory or cumulative is not, standing alone, sufficient reason to exclude it. *See id.* Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: (1) by shedding light on some issue; (2) by proving a necessary element of the case; (3) by enabling a witness to testify more effectively; (4) by corroborating testimony; or (5) by enabling jurors to better understand the testimony. *See id.* Other acceptable purposes include showing the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered. *See id.*

We hold that the circuit court did not abuse its discretion in admitting the photographs at issue because they served to corroborate McClain's testimony regarding the location of the wounds. While Airsman contends that the location of the wounds was not in dispute in light of the admission of the medical examiner's autopsy report, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it, as previously noted. *See DeAsis v. State*, 360 Ark. 286, 200 S.W.3d 911 (2005). It is only when an inflammatory or gruesome photograph is without any valid purpose that it should be excluded. *See Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001). Moreover, it could also be said that the photographs served to give the jury a different perspective on the wounds from that relayed by the report. *See, e.g., Smart v. State*, 352 Ark. 522, 104 S.W.3d 386 (2003) (observing that videotapes can give a different perspective than photographs and therefore can be helpful to the jury's understanding of the case). Just as we said in *Mosby v. State*, 350 Ark. 90, 97, 85 S.W.3d 500, 504 (2002),

SLIP OPINION

gruesome though the challenged photographs may have been and arguably cumulative in some instances, they were reviewed by the trial court and served to assist the trier of fact in understanding the testimony. For those reasons, their introduction into evidence did not constitute an abuse of discretion on the part of the trial court.

For the foregoing reasons, we affirm Airsman's convictions and sentence. Pursuant to Arkansas Supreme Court Rule 4–3(i) (2014), the record has been reviewed for all objections, motions, and requests that were decided adversely to Airsman, and no prejudicial error was found.

Affirmed.

*Camille Edmison-Wilhelmi*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Jake H. Jones*, Ass't Att'y Gen., for appellee.