**Wyouman David CAMP, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 10–290.**

Supreme Court of Arkansas.

April 14, 2011.

Cullen & Co., PLLC, by: Tim Cullen, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Lauren Elizabeth Heil, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice.

Appellant Wyouman David Camp appeals his conviction for first-degree murder as an accomplice and sentence of life imprisonment. On May 26, 2008, Harry Surber fatally shot Camp's wife, Robin Camp, allegedly at Camp's direction, while she was working as a cashier at a store in Nashville, Arkansas. At Camp's trial, Surber testified that Camp, with the help of his sister Jo Ann Hicks, hired him to murder Ms. Camp. Hicks also testified at

Camp's trial about her role in the conspiracy. On appeal, Camp contends that the circuit court erred in denying his motion for directed verdict because the State failed to sufficiently corroborate the testimony of his alleged accomplices. He also contends that the circuit court abused its discretion in allowing Terry Carter, a fellow inmate, to testify about Camp's attempt to hire Carter to murder an accomplice. Because this is a criminal appeal in which a sentence of life imprisonment has been imposed, this court has jurisdiction pursuant to Arkansas Supreme |₂Court Rule 1–2(a)(2) (2010). We affirm the circuit court.

## I. *Directed–Verdict Motion*

At the close of the State's evidence, Camp moved for a directed verdict, contending that the State failed to present sufficient evidence to corroborate his accomplices' testimony. On appeal, Camp renews his challenge to the sufficiency of the evidence. He asserts that his conviction cannot stand because the only evidence directly connecting him to the alleged murder conspiracy is testimony from Surber and Hicks, the two other alleged conspirators. Camp acknowledges that the State presented "a wealth" of circumstantial evidence, but he claims that this evidence does not tend to connect him with the commission of the crime.

■■■ On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *E.g., Evans v. State,* 2011 Ark. 33, 378 S.W.3d 82. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *E.g., Tubbs v. State,* 370 Ark. 47, 257 S.W.3d 47 (2007). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.*

A person commits murder in the first degree if, with a purpose of causing the death of another person, the person causes the death of another person. Ark.Code Ann. § 5–10–102(a)(2) (Repl.2006). A person acts "purposely" with respect to his or her conduct or as a |₃result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark.Code Ann. § 5–2–202(1) (Repl.2006).

A person is criminally liable for the conduct of another person if the person is an accomplice of another person in the commission of an offense. Ark.Code Ann. § 5–2–402(2) (Repl.2006). A person is an accomplice of another person in the commission of the offense if, with the purpose of promoting or facilitating the commission of an offense, the person solicits, advises, encourages, or coerces the other person to commit the offense. Ark.Code Ann. § 5–2–403(a)(1) (Repl.2006).

At Camp's trial, both Surber and Hicks testified for the State. Surber testified that, in exchange for $5000 and Camp's 1997 Dodge pickup truck, he shot Ms. Camp twice in the head at Family Dollar in Nashville on May 26, 2008. Surber stated that he first met Camp in April 2008 when Jo Ann Hicks, Surber's employer and girlfriend, introduced them to discuss the "business" of "do[ing] something to his wife."

Surber testified that, at first, the "business" was "about just crippling" Ms. Camp. According to Surber, Camp told him that

> he was tired of her running around here acting like she was queen bee and that she wouldn't help him all the times that

he helped her. He took her from, the quote was "from having nothing to having something." That she didn't have nothing when she came into this relationship and that he was afraid that she was going to leave him and that he wanted her crippled. He wanted her where she couldn't ever walk again.

Surber added that Camp told him he "wanted her shot in the legs or shot in the lower back."

Surber testified that Camp initially agreed to pay him $1000, in $500 installments, to shoot and disable Ms. Camp. Surber related that Camp told him that he would deliver the first installment a week later at Hicks's transmission shop in Ashdown, where Surber worked part time.

Surber stated that Camp arrived at the transmission shop the following week, handed him $500, and told him to "take care of my business." Surber testified that he later deposited $450 of the money Camp gave him.[1]

Surber stated that on May 9, 2008, he and Camp went to Nashville so Camp could show him the Family Dollar store where Ms. Camp worked. He said that when they arrived in Nashville, Camp showed him the Family Dollar store as planned and also showed him the car Ms. Camp drove and the route she took to work.

Surber stated that early the following Thursday, Camp called him and told him that there was a "change of plans" because he suspected Ms. Camp was romantically involved with an African–American man. According to Surber, Camp said he wanted Ms. Camp killed because she "left me for a nigger." Surber stated that Camp also said that

he took her from, the quote was, "zero to hero." She had nothing when she come into this relationship and he'll be damned if she has anything when she leaves from this relationship, that she wasn't going to get a dime.

Surber said that he asked Camp what he wanted done to Ms. Camp, and Camp told him he wanted her "completely dead. She ain't getting nothing." Surber stated that he agreed to kill Ms. Camp in exchange for $5000 and Camp's Dodge pickup truck, and that after discussing possible scenarios for the murder, Camp gave him a .38–caliber Smith and Wesson six-shot revolver. Surber described it as "an older gun with medium sized barrel, chrome with a white handle on it," and said that Camp told him the gun was "untraceable."

Surber testified that the following day, he and Hicks drove to Nashville to find out where Ms. Camp was living. They waited at a video store near the Family Dollar store where Ms. Camp worked, watched her with binoculars, and waited for her to leave so they could follow her home. The two followed Ms. Camp to a green house in Nashville, and, believing it to be her residence, telephoned Camp. Surber said that Camp wanted to see the house, so he and Hicks met him at the Wal–Mart in Hope at 10:00 p.m. and took him from there to the green house in Nashville.

Surber testified that when the three of them returned to Nashville, Ms. Camp's car was no longer at the green house, so they drove to several places in Nashville in an attempt to find her residence. Surber said that after Camp made a phone call to someone at approximately 11:00 p.m., he said that he knew "exactly where she's at," and directed Surber to drive to the

---

1. State's Exhibit 59, Surber's bank statement, showed a deposit in the amount of $450 on May 7, 2008.

Lockesburg Highway to look for Ms. Camp's car. Surber said that they were unable to locate her car, so they "called it off" and took Camp back to Hope.

According to Surber, he, Hicks, and Camp met for lunch on the following day, May 18, 2008. At that time, Surber said, Camp spoke on the phone to someone he called "Nee–Nee" or "NaNa," and obtained Ms. Camp's address. They then drove to Lovelis Apartments in Nashville and found Ms. Camp's car parked in front of one of the units. Surber said that Camp told him that, because Ms. Camp's residence was "in an excluded spot," he wanted Surber to, later that day, "walk up to the front door and knock on the door and shoot her in the head." Surber also said that Camp instructed him that when he shot Ms. Camp, at the prearranged time of 8:30 p.m., "[h]e wanted to be on the phone . . . so that he could hear the gunshot and he could hear her take her last breath."

Surber testified that later that night, he "watched [Ms. Camp's] house until close to 8:30," then looked in the window and "saw that she was on the phone." Surber said that he then knocked on Ms. Camp's door and asked her to use a phone to call a wrecker. Ms. Camp told him she was not going to open the door, and, according to Surber, she turned out the lights in the apartment because "she was spooked." Surber testified that he left when police, apparently responding to a call from Ms. Camp, arrived at her apartment.

Surber stated that on the following day, May 19, 2008, he called Camp from Hicks's ranch in Ogden to tell him what had occurred the previous night. According to Surber, Camp told him, "I know you were out there because I could hear you knocking on the door." Surber said he told

Camp he would go back to Ms. Camp's apartment in a couple of days, but Camp told him not to go because "he talked to [her] and she's spooked and she's not going to go back out there until she has someone staying with her out there."

Surber testified that he next heard from Camp on Sunday, May 25, 2008, when Camp called him and requested that Surber and Hicks come to his house in Stamps. According to Surber, when he and Hicks arrived at Camp's house, Camp told them that he had spoken to Ms. Camp and learned that she would be working at Family Dollar the next day, May 26, 2008, and that "he's got a new plan." Surber then testified as follows about the "new plan" Camp explained to him:

> [He said] that she will be working at the Family Dollar the next day for Memorial Day and . . . that he thinks [it] is going to . . . work this time. [He said] that she was gonna be there working and open up the store by herself, that there would be no one else in the store. . . . He said that it would be real easy to go ahead and just walk in, make it look like somebody robbed her, shoot her in the head and walk right back out. . . . I was kind of leery about it because stores like that have cameras in it. And when I expressed my feelings towards that he said there wasn't no cameras that work in there, and I asked him why. [Camp] turned around and told me because [Ms. Camp] told him the cameras don't work, 'cause a couple of months before I met him that they had something go on at the store and that the cameras[2] wasn't working over there and [Ms. Camp] told him that himself. . . . I asked: What about the store next to it, the grocery store named . . . Alps . . . I

2. Larry Marion, a police investigator for the City of Nashville, testified that the cameras in Family Dollar were not working at the time of the murder.

said I wanted to go ahead and find out about that.... I called Alps and Alps went ahead and confirmed that they were going to be open for Memorial Day.... I made the phone call from [Camp's] house.[3] [Camp] also told me that the doors open inward and the exit door opens outward and that you won't have to leave no fingerprints by just going ahead and using your shoulder and push inward and when you exit just use your shoulder to push outward.

Surber said that on May 26, 2008, he "did ... what [Camp] said to do" and shot Ms. Camp twice in the head as she worked alone at Family Dollar. Surber stated that he threw the .38–caliber gun that Camp gave him and that he used to kill Ms. Camp into the Little River |8near Highway 71. After Surber was arrested, police officers took Surber to the site where he said he had thrown the gun, and a diver recovered a .38–caliber Smith and Wesson gun with a pearl handle.

Hicks testified that Camp called her in April 2008 and "asked me if I [knew] anybody that would hurt his wife, [Ms. Camp], like cripple her or something to that effect." She testified that Camp specifically asked about Surber, and she later introduced them. Hicks said that Surber and Camp discussed a plan to disable Ms. Camp by "shooting her in the leg with a gun, crippling her leg," and "I think they agreed to $500 [as] a start." According to Hicks, Camp called her on May 14, 2008, and told her he was "going to change up the plan" and "have [Ms. Camp] killed ... [b]ecause she was leaving him for a nigger man." Hicks stated that she and Surber went to Camp's house on May 16, 2008,

and when she returned from a trip to the bathroom, Surber and Camp were discussing three guns that were on the kitchen table. Hicks said that one of the guns was "an old looking gun" that "had a white handle on it," and that Camp told Surber to take it because it was "untraceable." Hicks said that Surber took the gun and that, while she "never heard exactly ... the amount of money ..., they were talking about that [Camp] would owe him some more money plus a truck, a Dodge truck."

Hicks testified that, at Camp's request, she and Surber went to Nashville on May 17, 2008, to determine where Ms. Camp was living. She said that they followed Ms. Camp to a green house in Nashville and called Camp to tell him that they believed Ms. Camp lived |9there. Hicks said that she and Surber later met Camp at Wal–Mart in Hope at approximately 10:00 p.m., and the three of them returned to Nashville to look for Ms. Camp's residence. Hicks said that when they arrived at the green house in Nashville, they discovered that Ms. Camp's car was no longer there. She said they drove around Nashville looking for Ms. Camp's residence, but they were unsuccessful. She also stated that Camp called someone who, apparently, told him that Ms. Camp lived near the highway. Hicks said that they drove to the highway, but they were unable to find Ms. Camp's residence, so they took Camp back to Wal–Mart in Hope and went home.

Hicks also testified that, during a lunch meeting with Camp and Surber on Sunday, May 18, 2008, Camp spoke to "Nee–Nee" on the telephone and learned Ms. Camp's address. Hicks said that later

---

**3.** Landon Shepherd, an ARF manager for AT & T, Surber's cell phone carrier, testified that Surber's phone record indicated that on May 25, 2008, at 3:42 p.m., when Surber's phone was in Stamps, a call was made to a Nashville number. Surber testified that he remembered 845–5400, the phone number called at 3:42 p.m., as being the number for Alps in Nashville.

that evening, some time after dark, Surber, dressed in black clothes, went to "kill [Ms. Camp]," but "the plan didn't go."

Hicks stated that after Camp contacted her on Sunday, May 25, 2008, she and Surber went to Camp's house and discussed the plan to murder Ms. Camp. According to Hicks, Camp told Surber that the cameras in Family Dollar did not work, that Ms. Camp would go to work at 7:00 a.m., that she would be by herself on Memorial Day, and that Surber should "shoot her in the head; it was that simple."

Hicks said that she and Surber next saw Camp on Saturday, May 31, 2008, at her ranch in Ogden. She testified that Camp paid Surber $1000, which he later stored in the freezer at her residence in Texarkana. Hicks stated that she heard Surber and Camp talk about future payments, including the Dodge pickup truck. She said that "[t]hey talked about that it would be brought, after everything settled down, got quiet, that they would bring it to the farm for [Surber] to have the truck. They'd transfer it to me or I could transfer it to [Surber] where it would be [Surber's] truck." Hicks testified that, after Camp received a call from Surber following Surber's arrest, Camp delivered the truck to her Ogden ranch on July 6, 2008. A recording of the conversation between Surber and Camp was played for the jury. State's Exhibit 74, a transcript of the conversation, was admitted at trial without objection. Following is a relevant portion of the conversation:

SURBER: Okay, now there's some things I need you to do for me. Has Jo Ann already talked to you about that?

CAMP: Yeah.

SURBER: Okay. Now ... you please just, just do this alright? And have faith in me, alright? I'm going to keep you two out. If I, if I go down I'm gonna go down by myself like I already told you. Alright—I ride my own fucking heat. Alright? But I need you to take and sign that truck on over to Jo Ann so Jo Ann can sell that truck and uh pay Mickey half and send me the other half. Alright? You understand that?

CAMP: I don't know nothing about all that there, you'll have to talk to Jo Ann.

SURBER: Okay. Hey—I need to know. . . .

CAMP: 'Cause they probably taping all this mess and. . . .

SURBER: No, matter fact, they are not. I'm not on no damn phone that can be taped right now, alright? I'm not on no damn phone. If they were gonna tape it they would have me in my cell. Alright? You understand that? That's why my lawyer went ahead, I told him look, I need to make a phone call that cannot be taped or anything like that. You understand me? So, if you feel that, I honestly say I can understand where you're coming from. But if they would have had anything, like my lawyer said, it's all circumstance. I'm—he's almost positive that he can get me off with this bullshit. And if they would have had anything else, they would have went ahead and picked up you and Jo Ann already. So. . . .

CAMP: Yeah.

SURBER: You have nothing to worry about that. You understand me?

CAMP: Yeah.

. . . .

SURBER: Alright, well hey, like I told you. Do that, sign that over to Jo Ann so they can send me some money, okay?

CAMP: Alright, alright. I'll do it.

Police officers later discovered the Dodge truck at Hicks's ranch in Ogden. A search of Camp's house revealed the license and registration papers for the truck.

The State also presented testimony from witnesses who stated that Ms. Camp feared Camp would kill her. Brandy Holt, Ms. Camp's daughter, testified that on May 14, 2008, her mother called and told her that she wanted to leave Camp and requested that she come to their house because her mother was afraid that Camp would not let her leave. Holt stated that she went to the Camp home and that, while she was there, Camp said "[i]f he couldn't have her, nobody else could have her."

Wyquita Brown, one of Ms. Camp's co-workers at Family Dollar, testified that Ms. Camp arrived at her house late in the evening on May 14 or early in the morning on May 15, and that she stayed there "[b]ecause her and [Camp] got into an argument and she said that he had her by the throat against the wall and she wasn't going to stay there." Brown also testified that approximately one week before the murder, Ms. Camp told her that Camp "had told her if he couldn't have her nobody would and that he would kill her and hisself." Finally, Brown testified that the night before the murder Ms. Camp was upset and crying and told her that she was afraid of Camp.

Taneshia "Nee–Nee" Whitmore testified that she was at Family Dollar with Brown and Ms. Camp when Ms. Camp said that she was afraid Camp would kill her. She also testified that she told Camp Ms. Camp's new address in Nashville when she called to wish him a happy birthday on Sunday, May 18, 2008.

Randall Lewis, Ms. Camp's cousin, testified that Ms. Camp "acted scared" when he saw her a couple of weeks before she was murdered. He said that she told him she was scared because she was going to leave Camp, and Camp had told her that he would kill her if she left him. Lewis added that Ms. Camp told him if anything happened to her, "to look to [Camp]."

Officer Greg Parker of the Nashville Police Department testified that he knew Ms. Camp because he often conducted a "walk-through" at Family Dollar whenever an employee from the store called to report a suspected shoplifter. He testified that he saw Ms. Camp at Family Dollar the day before she was killed and "[s]he was acting kind of scared and nervous." Officer Parker said that he asked Ms. Camp why she was scared and she told him that "[s]he was afraid her husband was going to hurt her or kill her." He also said that, in the past, she had made "these types of statements" to him. Officer Parker further stated that Ms. Camp asked him to meet her the next morning when she opened the store to make sure she got inside safely. He said that the next day, he met her at the store and watched her walk inside.

The State also presented testimony regarding Camp's conduct after his arrest. Investigator Marion, who interviewed Camp a few hours after the murder on May 26, 2008, testified that Camp told him that, prior to May 26, it had been approximately one month since he had been in Nashville. The State introduced Camp's cell phone call record and "ping"[4] record, which were admitted without objection. The ping record showed that on May 17 and May 18, 2008, Camp's phone was in Nashville when calls were made.

4. Cell phones send "pings" to the nearest transmission tower. A cell phone's ping rec- ord can show the location of a cell phone.

Terry Carter testified that, following Camp's arrest, when he and Camp were both inmates at the Howard County Jail, Camp attempted to hire him to kill Hicks in exchange for paying Carter's bond. According to Carter, Camp wanted him to shoot Hicks because he thought she was "the weak link" in his case. Carter said that Camp thought Hicks "was gonna tell on him" and "she [was] the only thing that could have linked him to his wife." Carter said that Camp told him if Hicks "broke . . . he would be probably found convicted." Carter testified that Camp told him he had spoken to Surber on the phone after Surber had been arrested for the murder. Carter said that he asked Camp why he did not "hang up the phone or cuss him out or show any kind of remorse" after speaking to his wife's alleged killer. According to Carter, Camp responded, "Because she was a nigger lover."

In addition, the State presented evidence connecting Camp to the murder weapon. Holt testified that she believed the gun identified as the murder weapon had belonged to Camp, and she estimated she had seen it "twenty [or] thirty times over the years." Whitmore testified that she saw the same gun in a gun cabinet at Camp's house.

■ Camp challenges the sufficiency of the evidence on the basis that there was insufficient corroboration of his accomplices' testimony. A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. Ark.Code Ann. § 16–89–111(e)(1)(A) (Repl.2005). The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. Ark.Code Ann. § 16–89–111(e)(1)(B).

■ Corroboration must be evidence of a substantive nature, since it must be directed toward proving the connection of the accused with the crime, and not directed toward corroborating the accomplice's testimony. *E.g., MacKool v. State,* 365 Ark. 416, 231 S.W.3d 676 (2006). Circumstantial evidence may be used to support accomplice testimony, but it, too, must be substantial. *Id.* Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. *Id.* Rather, it need only, independently of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the crime. *Id.* The test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the remaining evidence independently establishes the crime and tends to connect the accused with its commission. *Id.*

In the instant case, the remaining evidence establishes the commission of the murder. On May 26, 2008, police officers responded to a 911 call reporting a dead body at Family Dollar in Nashville. Officer Parker testified that when he arrived at the store, he found Ms. Camp lying on the floor. Dr. Steven Erickson, deputy chief medical examiner for the Arkansas State Crime Lab, performed the autopsy on Ms. Camp. He testified that Ms. Camp's cause of death was gunshot wounds to the head and that her manner of death was homicide.

■ We must now determine whether the remaining evidence tends to connect Camp to the murder. It is well settled that the acts, conduct, and declarations of the accused, before or after the crime, may furnish necessary corroboration. *E.g., Barnett v. State,* 346 Ark. 11, 53 S.W.3d 527 (2001). In addition to Surber's and Hicks's testimony, the State presented the testimony of five witnesses—Holt, Brown,

Whitmore, Lewis, and Officer Parker—concerning Ms. Camp's fear that Camp would kill her. Whitmore's testimony that she informed Camp of Ms. Camp's new address in Nashville on May 18 corroborated Surber's and Hick's testimony that Camp obtained Ms. Camp's address from "Ne–Ne" on May 18. Both Whitmore and Holt identified the murder weapon as a gun belonging to Camp; their testimony corroborated Surber's and Hicks's testimony that Camp provided Surber with a gun.

State's Exhibit 10, a record of Camp's cell phone calls from May 1, 2008, through May 23, 2008, corroborated testimony from Surber and Hicks regarding when phone conversations with Camp took place; the exhibit also showed when Camp had phone conversations with ⌊16Ms. Camp. Moreover, the phone record showed that Camp's phone had been in Nashville on May 17 and 18, 2008, while in his statement to Investigator Marion, Camp indicated that he had not been in Nashville during the month of May. Surber's phone records showed that his phone was in Stamps the day before the murder; this evidence corroborated Surber's and Hicks's testimony that they went to Camp's house in Stamps that day to discuss plans for the murder.

Investigator Marion testified that the cameras in Family Dollar were not functioning at the time of the murder; his testimony corroborated Surber's testimony that Camp told him the cameras in the store did not work. Carter, Camp's fellow inmate, testified that Camp attempted to hire him to kill Hicks because she was the "weak link" in his case. He also testified that Camp told him he had no remorse for his wife's death "[b]ecause she was a nigger lover." This testimony was consistent with Surber's and Hicks's testimony that Camp decided to have Ms. Camp killed because he suspected that she was involved in a relationship with an African-American man. Finally, after Surber told Camp, in a recorded conversation, to deliver the Dodge pickup truck as previously planned, police officers discovered the truck at Hicks's ranch in Ogden and the license and registration papers at Camp's house. The foregoing evidence tends to connect Camp to the offense for which he was charged. The circuit court did not err in denying Camp's motion for directed verdict.

## II.  *Admission of 404(b) Testimony*

⌊17Camp contends that, pursuant to Arkansas Rules of Evidence 404(b) (2010), the circuit court abused its discretion in allowing a fellow inmate to testify about Camp's attempt to hire him to murder an accomplice because the testimony lacked probative value and was unduly prejudicial. As previously noted, Terry Carter testified that Camp attempted to hire him to kill Hicks in exchange for paying his bond.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ark. R. Evid. 404(b).

The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the circuit court, and this court will not reverse absent a showing of manifest abuse of discretion. *Lamb v. State*, 372 Ark. 277, 275 S.W.3d 144 (2008). It is well settled by this court that testimony of other criminal activity is admissible "if it is independently relevant to the main issue, that is, relevant in the sense of tending to prove some material point rather than merely to prove that the defendant is a criminal." *Green v. State*,

365 Ark. 478, 494, 231 S.W.3d 638, 651 (2006). In other words, the evidence offered under Rule 404(b) must make the existence of any fact of consequence more or less probable than it would be without the evidence. *Id.*, 231 S.W.3d at 651. When evidence of another crime or wrong reflects consciousness of guilt of the commission of the crime charged, it is independently relevant and ̲₁₈admissible under Rule 404(b). *E.g., Banks v. State*, 2010 Ark. 108, 366 S.W.3d 341.

Carter's testimony about Camp's attempt to hire him to kill Hicks reflected Camp's consciousness of guilt and was independently relevant. According to Carter, Camp wanted him to kill Hicks because she was a "weak link" in his case and her testimony against him would likely result in a conviction for murder. We have held that an attempt to tamper with or silence witnesses to thwart prosecution for the charged offense is evidence of consciousness of guilt and constitutes relevant evidence. *E.g., Banks, supra.* We hold that Carter's testimony was properly admitted pursuant to Rule 404(b).

Camp further asserts that Carter's testimony should have been excluded because it was more prejudicial than probative. The balancing of probative value against prejudice, under Arkansas Rule of Evidence 403, is a matter left to the sound discretion of the circuit court, and the circuit court's decision on such a matter will not be reversed absent a manifest abuse of that discretion. *Id.* Based on our review of the testimony, we hold that the circuit court did not abuse its discretion in allowing Carter to testify.

### III. *4–3(i)*

Pursuant to Arkansas Supreme Court Rule 4–3(i) (2010), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Camp, and no prejudicial error has been found.

Affirmed.