# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-15-112

| | | |
|---|---|---|
| LORI ROSE | APPELLANT | Opinion Delivered   October 7, 2015 |
| V. | | APPEAL FROM THE POLK COUNTY CIRCUIT COURT [NO. CR-2013-158] |
| STATE OF ARKANSAS | APPELLEE | HONORABLE J.W. LOONEY, JUDGE |
| | | AFFIRMED |

## CLIFF HOOFMAN, Judge

After a jury trial, appellant Lori Rose was convicted of aggravated residential burglary, second-degree domestic battery, aggravated assault, and terroristic threatening. She was sentenced to a total of thirty-six years' imprisonment. On appeal, Rose argues that the trial court erred by denying her motion for directed verdict on the charge of aggravated residential burglary. We affirm.

At trial, the victim, Billy Vaught, testified that he and Rose were in a romantic relationship for approximately two years until they broke up on November 19, 2013. On the evening of November 21, 2013, Vaught stated that Rose's teenage daughter, April, phoned him and asked him to come stay at her home because she was scared and had not been able to reach her mother. Vaught testified that after he unsuccessfully attempted to contact Rose, he went to her home, spoke with April, and then slept on the couch. Rose arrived home at approximately 3:00 a.m. and went to sleep in her room, while Vaught remained on the

couch. He agreed to take April to school the next morning because Rose had to be at work early. At 6:45 a.m., after Rose had left for work, Vaught stated that he received a text from her, telling him to get out of her house. He stated that he did not think this was strange, as they had been texting back and forth earlier that week and Rose had mentioned that he had no reason to be at her home going forward. He then collected his belongings and left the home. Vaught denied that he had acted inappropriately toward April that morning, as Rose later claimed.

The next evening, November 22, 2013, Vaught testified that he went to bed early. He woke up around midnight when Rose entered his bedroom and turned the light on. He stated that she had a rifle that he had previously loaned to her pointed at his upper body. He testified that Rose told him not to move and "to prepare to die, Billy Vaught." Vaught asked her what she was talking about, and she told him that he had hurt her daughter. He denied hurting her and told Rose to call the police and let them handle the situation. She replied, "No, they told me to just shoot your ass." Vaught stated that he could tell that the hammer on the rifle had been cocked and that Rose had been drinking, so he kicked the gun with his left leg. The rifle went off and shot Vaught in the right leg just below the knee. He briefly struggled with Rose and retrieved the gun, then called his sister, who drove him to the hospital. Rose left before Vaught's sister arrived.

Vaught testified that the gunshot broke his kneecap and femur bone and that he had to have knee-replacement surgery. Vaught admitted that he had initially claimed the shooting was an accident, explaining that he did not want to cause problems for anyone else and that

he had a prior relationship with Rose. During their relationship, Vaught indicated that they would frequently stay at each other's homes and that it was not necessary for them to have an explicit invitation to do so. Vaught testified that he had not told Rose that she was no longer welcome in his home prior to the shooting.

Chief Deputy Scott Sawyer with the Polk County Sheriff's Department testified that he spoke with Vaught at the hospital in the early morning hours of November 23, 2013. Although Vaught initially told him that the shooting was an accident, Sawyer stated that after he told Vaught that was physically impossible, Vaught admitted that Rose had shot him. Rose was taken into custody that night by Deputy Seth Smith, and a statement was obtained from her. In her first statement, a recording of which was played for the jury, Rose admitted that she had filed a police report against Vaught for alleged sexual abuse of her daughter, but she denied that she had been to his home or that she had shot him that night. She instead stated that she had been out drinking and had then gone home. Rose also claimed that she and Vaught had been dating until the previous morning. Smith testified that Rose did not appear to be highly intoxicated at the time he obtained her statement, although he could smell alcohol on her.

The following day, on November 24, 2013, Rose asked to give another statement to police. In her second statement, which was also played at trial, Rose claimed that she was scared and intoxicated and had not told the truth during her earlier interview. She admitted that she had gone to Vaught's home around midnight on November 23. Rose stated that she had been drinking at the Elk's Lodge and had been told by someone there that Vaught had

also acted inappropriately toward his son in the past. She indicated that she went to Vaught's home, not with the purpose of confronting him, but instead with the intention of taking his son home with her. She did not expect Vaught to be at home, but when she realized that he was asleep in his bedroom, she testified that she grabbed the rifle sitting by the front door and went to speak to him. Rose agreed that this was the rifle that Vaught had loaned to her, but she claimed that she had returned it to his house after they had broken up earlier in the week. She stated that she grabbed it for protection, wanting only to intimidate Vaught and make him apologize. Rose then walked into Vaught's bedroom, identified herself, and asked him why he had hurt her daughter. She stated that the rifle was pointed toward the ground, not at Vaught. However, when he kicked it, the gun went off and shot him in the leg. She indicated that they struggled over the gun until Vaught gained control of the weapon. She handed him his cell phone to call for help and stated that Vaught then told her to leave. Rose stated that she did not remember the details of her drive home.

Terry Plunkett, a mutual friend of both Rose and Vaught, testified that he saw Rose on November 22, 2013, and that he was aware of the allegations she had made against Vaught. Plunkett stated that he received a text from Rose that morning indicating that she had her gun "fully loaded," although he did not think that she was being serious. Plunkett also saw Rose at the Elk's Lodge later that night, and he described her as being very intoxicated. He wanted to drive her home, but she left before he could do so.

At the conclusion of the State's case, Rose moved for a directed verdict only on the charge of aggravated residential burglary, arguing that there was insufficient proof that she had

entered or remained in Vaught's residence unlawfully. The circuit court denied the motion.

At trial, Rose stated that she and Vaught had broken up on the Tuesday prior to the shooting, although they had been involved in a serious relationship for the previous two years. Rose stated that they had broken up on prior occasions and had gotten back together within a couple of days; however, she indicated that this particular breakup stood out and that it seemed that they both wanted to finally move on. She testified that she had taken some of his belongings, including the rifle, to his house on the day after their breakup and that he had then texted her that she was always welcome in his home. Rose indicated that Vaught's house was always unlocked. With regard to the details surrounding the shooting, Rose testified in conformity with her second statement to police. She stated that Vaught's door was not locked and that she grabbed the rifle as a "boundary" between them because she "did not know how he was going to react to [her] being in the house you know after what happened." However, she testified that she "had every right to go in the house" and that no one had said that she could not go in there.

After both sides had rested their case, Rose renewed her motion for directed verdict, which was again denied by the circuit court. The jury found Rose guilty of all charges, sentencing her to twenty-four years' imprisonment for the aggravated-residential-burglary conviction and three years on each of the remaining charges. In addition, Rose received a twelve-year sentence enhancement for each offense due to her use of a firearm. The circuit court ordered the three-year sentences to run consecutively to each other but concurrent to the twenty-four-year sentence. The court also ran one twelve-year sentence enhancement

consecutively to Rose's remaining sentences, while the other enhancements were to run concurrently, for a total of thirty-six years' imprisonment. Rose filed a timely notice of appeal from the sentencing order.

For her sole argument on appeal, Rose contends that the circuit court erred in denying her motion for directed verdict on the charge of aggravated residential burglary. Specifically, Rose argues, as she did in her directed-verdict motions at trial, that the evidence was insufficient to support her conviction because the State failed to prove that she entered or remained unlawfully in Vaught's home.

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Williams v. State*, 2010 Ark. App. 759. On appeal from a denial of a motion for directed verdict, the sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* In determining whether there is substantial evidence to support the verdict, this court reviews the evidence in the light most favorable to the State and considers only that evidence which supports the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* The jury is free to believe all or part of a witness's testimony, and we do not weigh the credibility of witnesses on appeal, as that is a job for the fact-finder and not the appellate court. *Young v. State*, 371 Ark. 393, 266 S.W.3d 744 (2007).

A person commits the offense of residential burglary if he or she enters or remains unlawfully in a residential occupiable structure of another person with the purpose of

committing in the residential occupiable structure any offense punishable by imprisonment. Ark. Code Ann. § 5-39-201(a) (Repl. 2013). A person "enters or remains unlawfully" when he or she does not have a license or a privilege to enter or remain upon the premises. Ark. Code Ann. § 5-39-101(2)(A) (Repl. 2013). Furthermore, a person commits aggravated residential burglary if he or she commits residential burglary as defined above and (1) is armed with a deadly weapon or represents by word or conduct that he or she is armed with a deadly weapon; or (2) inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5-39-204(a) (Repl. 2013).

Rose argues that she had a privilege or a license to enter Vaught's home during their relationship and that, according to his testimony at trial, he never revoked this privilege or license prior to the shooting. While Vaught did admit on cross-examination that he had never explicitly told Rose that she was no longer welcome in his home after their breakup, the State asserts that any privilege or license Rose had as Vaught's girlfriend was implicitly revoked when that relationship ended and that no express revocation was necessary. Rose admitted in her testimony that, even though they had broken up on previous occasions, this time was different in that they both wanted to "move on." Although Rose testified that Vaught had sent her a text stating that she was always welcome in his home, she did not introduce this text message into evidence. As the State argues, the jury was not required to believe her self-serving testimony, nor was it required to set aside its common sense and experience in reaching a verdict. *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996). As such, the jury could have reasonably found from the evidence that Rose no longer had a

license or privilege to enter Vaught's home on the night of the shooting, especially late at night when he was asleep. *See Holt v. State*, 2011 Ark. 391, 384 S.W.3d 498 (stating that the jury could have easily determined that the defendant's invitation to enter his ex-girlfriend's home was not so extensive as to include entry in the middle of the night while she was asleep).

Furthermore, even if Rose's initial entry into Vaught's home was not considered to be unlawful, the residential-burglary statute also states that a person cannot *remain* in the residence unlawfully. Ark. Code Ann. § 5-39-201(a). In this regard, our supreme court has held that a person's license or privilege to enter a home is revoked once that person inflicts injury upon the owner. *See, e.g., Holt v. State, supra* (holding that even if the jury believed the defendant's testimony that he had been invited to the victim's residence, he was not privileged to remain there once he began telling the victim "I told you I could get in anytime I wanted to" and "if I can't have you, no one can," and stabbing her); *Young v. State, supra* (holding that substantial evidence supported the defendant's conviction for residential burglary where the defendant was licensed or privileged to enter the victim's residence but was certainly not licensed or privileged to remain there after he began stabbing the owner and removing his property).

Here, the evidence showed that Rose entered Vaught's home while he was asleep, grabbed a loaded rifle, and then pointed the gun at him, telling him not to move and to "prepare to die." Vaught pleaded with Rose to call the police and was then shot in the leg as he attempted to kick the gun away. After Vaught regained control of the gun, he phoned

8

for help and told Rose to leave. Under the circumstances in this case, there was substantial evidence to support a finding by the jury that Rose unlawfully entered or remained in Vaught's home, and we therefore affirm her conviction for aggravated residential burglary.

Affirmed.

GLADWIN, C.J., and WHITEAKER, J., agree.

*Witt Law Firm, P.C.*, by: *Ernie Witt*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Pamela Rumpz*, Ass't Att'y Gen., for appellee.