Cite as 2021 Ark. App. 117

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CR-20-314

| | | |
|---|---|---|
| RODNEY L. BAKER | | **Opinion Delivered:** March 10, 2021 |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-17-1269] |
| V. | | |
| | | HONORABLE ROBIN F. GREEN, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

## PHILLIP T. WHITEAKER, Judge

A Benton County jury convicted appellant Rodney Baker of one count of aggravated residential burglary and one count of first-degree battery. He was sentenced to a total of eighteen years in the Arkansas Department of Correction. On appeal, Baker challenges the sufficiency of the evidence supporting his convictions; in addition, he argues that the circuit court erred in denying his motion for a mistrial and in denying his motion for continuance after the mistrial was denied. We find no error and affirm.

## I. *Factual Background*

In June 2017, Kevin Luper was severely beaten and injured. Baker was arrested, charged, and convicted in relation to this beating and injury. We find it helpful to explain the relationships among the individuals involved in the case and the facts that led to the battery.

Kevin, the victim, was dating Baker's niece, Dreama Helvey. Kevin lived in an apartment over his truck-repair shop, and Dreama occasionally would spend the night with Kevin. She did so on the night before the beating. On the day of the beating, Kevin and Dreama were at Kevin's place and were joined by Diane Arnold, Dreama's mother. Kevin had been drinking and was intoxicated. Dreama left Kevin's place for a while, leaving Kevin and Diane alone. When Dreama returned, Diane was "really upset" and accused Kevin of sexually assaulting her.

After leaving Kevin's place, Diane drove to an E-Z Mart in Lowell where she called her sister, Karen "Sue" Baker, the wife of appellant Baker. On the phone, Diane was extremely upset and "screaming and yelling." At Sue's request, Baker and a friend drove to the E-Z Mart, picked up Diane, and took her back to Baker's house. At Baker's home, Diane reported that Kevin had "stuck his tongue down her throat and reached up her shorts." Baker then angrily called Dreama to confront her about what had happened. Dreama insisted that Kevin was drunk and had just "gotten handsy" with Diane. About half an hour later, however, Baker texted Dreama the following message: "So you didn't tell the whole story did you tell that mother fucker come on out I got something for him."[1]

Meanwhile, Dreama's brother, Mitchell Arnold, became aware of the allegations Diane had made against Kevin. Mitchell called Matthew "Ryder" Vansickle and Noah Craig and told them that Kevin had sexually assaulted his mother. Mitchell, Noah, Ryder, and their girlfriends, Karen Hatfield and Stacy Carmichael, went to Baker's house. At

---

[1]Dreama did not see the text until later in the evening.

Baker's home, the four men—Baker, Mitchell, Ryder, and Noah—talked about going to Kevin's house to "whip his ass." After they talked for about fifteen minutes, Mitchell and Noah got in one car, Ryder and Baker got in another, and they drove to Kevin's.

Back at Kevin's place, Dreama had gone upstairs to bed while Kevin was passed out in the bed of a flatbed truck that was parked in his truck-repair shop. When Baker and the others arrived, they banged on the door awaking Dreama. Eventually, Baker and the others entered Kevin's place,[2] pulled Kevin out of the truck bed, and begin hitting and kicking him.

After the attack, Baker and the others returned to Baker's house. Dreama called 911 to report the attack. In her report, she was able to identify the assailants, including Baker.[3] Kevin was severely beaten in the attack. His mandible was fractured in several places, and both cheekbones and his eye sockets had multiple fractures.

Baker was charged as an accomplice in the aggravated residential burglary and first-degree battery. The information also reflected an enhancement for engaging in violent criminal group activity. Following a jury trial, Baker was convicted on both counts and the enhancement. The jury imposed a sentence of ten years for the aggravated residential burglary and eight years for the first-degree battery and recommended that they be served consecutively. The circuit court accepted the jury's recommendation, and Baker was sentenced to a total of eighteen years in prison. His timely appeal followed.

---

[2]Witnesses' accounts differed about whether Dreama opened the door or the men burst in, which will be discussed in more detail later in this opinion.

[3]In her 911 report, Dreama did not identify her brother, Mitchell, as an assailant but did so later in the investigation.

## II.  *Sufficiency of the Evidence*

Baker's first four points on appeal challenge the sufficiency of the evidence supporting his convictions for aggravated residential burglary and first-degree battery. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 214. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Camp v. State*, 2011 Ark. 155, 381 S.W.3d 11. On appeal, we review the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Milner v. State*, 2020 Ark. App. 546.

## A.  Residential Burglary

Of his four arguments challenging the sufficiency of the evidence, Baker raises two arguments challenging his conviction for aggravated residential burglary. We therefore set out the relevant statutory provisions here. A person commits aggravated residential burglary if he or she inflicts or attempts to inflict death or serious physical injury on another person while committing residential burglary as defined in Ark. Code Ann. § 5-39-204(a)(2) (Repl. 2013). A person commits residential burglary if he or she enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing in the residential occupiable structure any offense punishable by imprisonment. Ark. Code Ann. § 5-39-201(a)(1) (Repl. 2013). A "residential occupiable structure" means a vehicle, building, or other structure in which any person lives or that is customarily used for overnight

4

accommodation of a person whether or not a person is actually present. Ark. Code Ann. § 5-39-101(8)(A) (Supp. 2019).

Baker argues first that the building in which the assault took place was not a "residential occupiable structure." He contends that the truck-repair shop where the attack happened was not Kevin's residence, so he therefore could not be guilty of aggravated residential burglary. We disagree.

According to our caselaw, "[j]ust as the definition of 'occupiable' does not depend on the presence of a person in a building, it does not depend on whether it is being used for some other purpose as long as 'the nature of the premise' is that it is 'occupiable.'" *Julian v. State*, 298 Ark. 302, 304, 767 S.W.2d 300, 301 (1989). In *Horton v. State*, 2014 Ark. App. 250, this court held that a garage attached to a house was a residential occupiable structure despite appellant's argument that there was no evidence that the burglary victim lived in the garage or customarily used it for overnight accommodation. This court determined that because the garage was attached to the home and was an integral part of the home and was a place "where people are likely to be," it met the statutory definition of a residential occupiable structure. *Id*. at 6.

Applying this caselaw to the facts presented at trial, we conclude that Kevin's shop was an "occupiable residential structure." Dreama testified that Kevin had a "room upstairs" in his truck-repair shop and had been living there since 2015. She explained that he had a bed and living space with running water, a bathroom, a place to cook, and an air conditioner. She further testified that she stayed with Kevin three nights a week and had spent the night there before the attack. Kevin testified that he had built the apartment in his

garage and had lived there for a year and half or two years; he said that he had running water, was able to cook for himself, and had a bed and an air conditioner. Thus, the jury was presented with evidence that the shop where Kevin built his apartment was "occupiable" and was a place "where people are likely to be."

Baker nonetheless argues that the State failed to prove that he or any of the participants in the attack entered the residential portion of the building to commit the offenses; rather, he contends that the evidence proves at best entry into the commercial portion of the premises. However, he cites no authority for the premise that a crime must be committed solely within the confines of a living space that is found within a larger building. It is axiomatic that we will not consider arguments that are unsupported by convincing argument or citation to relevant authority. *See Butry-Weston v. State*, 2021 Ark. App. 51, 616 S.W.3d 685; *King v. State*, 2016 Ark. App. 292, 494 S.W.3d 463.

In his second challenge to his conviction for aggravated residential burglary, Baker contends that the evidence was insufficient to support the "burglary" element of his conviction because there was no evidence that he unlawfully entered the premises. As noted above, to commit aggravated residential burglary, one must commit residential burglary, which requires that one enter or remain unlawfully in a residential occupiable structure with the purpose of committing any offense punishable by imprisonment. To "enter or remain unlawfully" means "to enter or remain in or upon premises when not licensed or privileged to enter or remain in or upon the premises." Ark. Code Ann. § 5-39-101(3)(A); *Jefferson v. State*, 2017 Ark. App. 492, 532 S.W.3d 75.

6

Baker contends that there was no proof that he "entered [the] shop illegally or [was] told to get out." We disagree. Admittedly, the jury was presented with conflicting evidence of how entry was obtained. Dreama testified that she was awakened by loud banging at the door and that she was only halfway across the room when the door swung open with Baker and the others making uninvited entry. On the other hand, Baker, Ryder, and Noah all testified that Dreama opened the door to the shop. Obviously, the jury was presented with conflicting evidence about entry. The jury was not, however, obligated to believe Baker's self-serving account, *see, e.g.*, *Scaggs v. State*, 2020 Ark. App. 142, 596 S.W.3d 562, nor are we.

We conclude that Baker's argument does not address the entirety of the evidence that was presented to the jury. For example, although Noah testified that Dreama opened the door, he added that "[they] all kind of pushed [their] way past her and went inside. She did not invite us in. We forced our way in." Ryder likewise testified that Dreama opened the door, but he added that as they went in, Mitchell hit the door and told Dreama he should "beat your ass, bitch, for letting this happen to mom" before "storming in." There was therefore evidence from which the jury could conclude that Baker and the others entered the premises when not licensed to do so.

Moreover, even assuming that Dreama did, in fact, open the door and permit the men's entry, our court has noted that a person's license or privilege to enter a home is revoked once that person inflicts injury on the owner. *Holland v. State*, 2017 Ark. App. 49, at 5, 510 S.W.3d 311, 314 (citing *Holt v. State*, 2011 Ark. 391, 384 S.W.3d 498); *see also* *Rose v. State*, 2015 Ark. App. 563, 472 S.W.3d 167. Thus, even assuming Baker's entry into

7

the building was lawful, once the assault on Kevin began, his privilege to be there was revoked. We therefore affirm on this issue as well.

## B. First-Degree Battery

In his next challenge to the sufficiency of the evidence, Baker argues that Kevin's injuries were not sufficiently severe to support his conviction for first-degree battery. Baker was charged with and convicted of first-degree battery under Arkansas Code Annotated section 5-13-201(a)(3) (Supp. 2019), which provides that a person commits this offense if he or she "causes serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life." "Serious physical injury" is defined as "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102(21) (Repl. 2013).

Baker does not dispute that Kevin was badly beaten. He argues, however, that his injuries did not meet the definition of a "serious physical injury" because none of his injuries were permanent. We disagree with Baker's assessment of the evidence.

The jury was presented sufficient evidence of serious physical injury. The State introduced graphic photographs at trial depicting the injuries to Kevin's face and head. The jury heard testimony from medical professionals concerning the seriousness of the injury. Victor Cozens, the paramedic who responded to Dreama's 911 call and treated Kevin at the scene, explained that Kevin had a broken mandible, missing teeth, and a large amount of blood loss. Dr. Burdge Green, the emergency-room doctor who treated Kevin at the hospital, testified that Kevin experienced multiple facial fractures. He reported that it would

8

take between eight and twelve weeks for Kevin's fractures to heal, that the fractured cheek bones could cause potential long-term scarring and disfigurement, and the injuries to the eye sockets could cause vision changes. Dr. Green further explained that Kevin could be dealing with his injuries "for a year out or more," noting that there are nerves in the mandible that could cause chronic pain.

The jury also heard layperson testimony concerning the seriousness of the injuries. Dreama testified that Kevin's face was swollen "about double in size for about a month"; and he has scars on his face. Detective Hammontree testified that as he investigated the scene and saw the sheer amount of blood on the floor of the shop, he was "worried it might turn into a homicide investigation" and that when he went to interview Kevin in the hospital, he believed he was "there to possibly take what is called a dying declaration." Finally, Kevin himself testified about his injuries. He was hospitalized for three days and had to remain on a liquid diet for about a month because of his broken jaw and missing teeth. In fact, by the time of the trial, he was still having problems from some of his teeth that had been broken in the attack. He stated that he has scars from the incident, including a hole in his lip and a scar across his eye. Kevin explained that although he has insurance, it does not cover dental or vision, so he is unable to get glasses to correct the vision problems that he sustained in the attack.

Whether a person has suffered serious physical injury is ordinarily an issue for the trier of fact. *Johnson v. State*, 2017 Ark. App. 71, 510 S.W.3d 298. It is not necessary that the impairment be permanent but only protracted, and the fact that the victim ultimately recovers has no bearing on whether the injury sustained is serious. *Huggins v. State*, 2021

9

Ark. App. 74, 618 S.W.3d 187. The evidence described above clearly supports the jury's conclusion that Kevin suffered "serious physical injuries" within the meaning of the statute, and Baker's argument regarding the permanency of Kevin's injury is neither well-taken nor supported by caselaw or the evidence. We therefore affirm Baker's conviction for first-degree battery.

### C. Accomplice Liability

As mentioned above, Baker was charged as an accomplice to both aggravated residential burglary and first-degree battery. In his final challenge to the sufficiency of the evidence, he argues that the evidence failed to prove he was an accomplice "rather than simply being in the wrong place at the wrong time."[4]

A person is criminally liable for the conduct of another person when he is the accomplice of another person in the commission of an offense. Ark. Code Ann. § 5-2-402 (Repl. 2013); *Davis v. State*, 2013 Ark. App. 658, 430 S.W.3d 190. An accomplice is a person who, with the purpose of promoting or facilitating the commission of an offense, solicits, advises, encourages, or coerces the other person to commit it; aids, agrees to aid, or

---

[4]We note that the original and amended criminal informations filed in this case charged Baker as an accomplice to both aggravated residential burglary and first-degree battery. Regarding aggravated residential burglary, the jury was instructed that it had to find that "Rodney Baker *or an accomplice*" committed the offense (emphasis added); however, the instruction regarding first-degree battery stated only that the jury had to find that "Rodney Baker caused serious physical injury to Kevin Luper under circumstances manifesting extreme indifference to the value of human life." Nevertheless, the jury was also instructed regarding accomplice liability and informed that Ryder Vansickle and Noah Craig were accomplices and that the jury could not convict Baker of "aggravated residential burglary *and* battery in the first degree upon the testimony of those witnesses unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the offenses." (Emphasis added.)

attempts to aid the other person in planning or committing it; or having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so. Ark. Code Ann. § 5-2-403; *Davis*, *supra*.

When a theory of accomplice liability is implicated, we affirm if substantial evidence exists to show that the defendant acted as an accomplice in the commission of the alleged offense. *Price v. State*, 2019 Ark. 323, at 5, 588 S.W.3d 1, 4. We have said that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Id.* When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.* One cannot disclaim accomplice liability simply because he or she did not personally take part in every act that went to make up the crime as a whole. *West v. State*, 2020 Ark. App. 522.

On appeal, Baker argues that there was no proof that he and the others developed a plan to beat Kevin or that he actually participated in the beating. In support of these contentions, Baker cherry-picks the witnesses' testimony and isolates specific phrases, such as his own testimony that there was "never a plan . . . for me or anybody to go down there and beat him half to death" and that he "did not ever touch the man." He points to Dreama's statement that she did not remember who was hitting and kicking Kevin and that she did not "literally see" Baker strike Kevin. Baker also cites Ryder's and Noah's testimony that there was no plan to attack Kevin.

We are not persuaded by Baker's arguments. Concerning whether he and the others developed a plan to beat Kevin, Ryder testified that he, Baker, Noah, and Mitchell talked in a group about going to Kevin's house. Ryder said he had no doubt that Baker was "in

it with us that night. . . . [He was] the one responsible for sort of getting the group together." Finally, Ryder testified it was his "understanding that Rodney Baker and Mitchell Arnold had a plan." Both Stacy Carmichael, Ryder's girlfriend, and Karen Hatfield, Noah's girlfriend, testified that the four men were huddled together talking before they all left at the same time in separate vehicles.

Further, although Baker claims in his brief that "no one could even confirm they actually saw [him] participate in any way other than just standing there," this is categorically untrue. Dreama testified that "all four [were] participating in the punching." On a scale of one to ten, she said it was "a ten" that she saw Baker, along with the others, punching Kevin. Dreama stated, "I watched Rodney [and the others] punching and kicking Kevin." Ryder testified, "I saw Rodney punch Kevin. . . . I am 100 percent confident that I saw Rodney Baker also throw a punch." Noah said, "When I said they continued to beat on him, I am talking about Rodney [and the others]. . . . I am very confident that Rodney, Mitchell and Ryder were beating on Kevin. I saw all three of them throwing punches. I do not recall any point in time when Rodney was standing away from the group."

Additionally, the jury heard testimony that called Baker's credibility into question. On initial questioning by law enforcement, Baker denied any knowledge of what may or may not have happened to Kevin. He told the detaining officer that he had not left his residence all day. Despite denying that he had any knowledge of the attack, while he was being detained, Baker told the others who were there, "[No]body answer any of their questions" and moments later said, "[D]on't consent to no search."

12

At the police station, Baker changed his story to admit that he had contact with Diane, heard her allegations against Kevin, and left his home to go and get her. He further changed his story to admit his phone call and text to Dreama, although he continued to deny having seen Kevin that day. When questioned about a cut on his hand, he told law enforcement that he cut his finger on a piece of tin earlier in the day. Both Stacy Carmichael and Karen Hatfield, however, testified that when they arrived at Baker's home, his hand was not wounded; but on his return from Kevin's, he had a cut on his hand that required bandaging, and he had blood on his shirt. Karen heard Mitchell yelling that they "got to burn it all," and Noah heard Baker say, "[N]obody talks, everybody walks." This evidence is clearly sufficient to support the jury's finding that Baker was either an accomplice or a principal to both the aggravated residential burglary and the first-degree battery.

III. *Motion for Mistrial/Motion for Continuance*

In his final point on appeal, Baker assigns error to the circuit court's denial of his motion for mistrial and motion for continuance that occurred during closing arguments. We first set out the circumstances surrounding those motions.

At the completion of the guilt phase, the jury found Baker guilty. During the penalty phase, Baker called several character witnesses, and the circuit court then instructed the jury regarding sentencing from a set of instructions agreed to by the parties. Concerning the offense of aggravated residential burglary, a Class Y felony, the court informed the jury that this offense was punishable by imprisonment in the Arkansas Department of Correction for "not less than ten years nor more than forty years, or life, *or* by a fine not exceeding $15,000, *or* both an imprisonment and a fine." (Emphasis added.)

13

During his closing argument, defense counsel argued that Baker had "lived a good life except this one night" and implored the jury to impose only a fine. At that point, the State interrupted Baker's closing argument to point out that the Y felony jury instruction the court had given was incorrect because the model instruction provided for only a prison sentence and did not have an option for only a fine. The court and the attorneys looked at the sentencing statute and realized that the instruction given had, in fact, been incorrect. Defense counsel complained that his entire closing argument had been premised on the possibility of a sentence of a fine and asked for a mistrial. The State objected, suggesting that both parties had missed the error and that an admonishment would be sufficient to cure the mistake. The court said it would let counsel start his closing argument over but denied the motion for mistrial.

Defense counsel then argued that the error had "literally gutted [his] entire theme of this entire case," pointing out that he could have called more character witnesses if he had known what the sentencing instruction was going to be. As a result, counsel asked the court for a continuance until the next day to craft a new closing argument. The court denied that request but offered a thirty-minute break to adjust his argument. The court then advised the jury that there had been an error in the instructions and advised them of the correct sentencing range on the Y felony offense. Baker's attorney went on to conclude his closing argument and asked the jury for the minimum sentence on both offenses. The jury subsequently retired to deliberate and later returned with the minimum sentence of ten years on the Y felony offense of aggravated residential burglary and eight years on the Class A felony offense of first-degree battery.

Baker argues that the circuit court erred in denying his motion for a mistrial. A mistrial is a drastic remedy and should be declared when there has been an error so prejudicial that justice cannot be served by continuing the trial or when it cannot be cured by an instruction. *Halliburton v. State*, 2020 Ark. 101, at 18, 594 S.W.3d 856, 867. The grant or denial of a motion for mistrial lies within the sound discretion of the circuit court, and the exercise of that discretion should not be disturbed on appeal unless an abuse of discretion or manifest prejudice to the complaining party is shown. *Barnum v. State*, 2020 Ark. App. 523, 614 S.W.3d 453. Similarly, a circuit court's decision to grant or deny a continuance will not be reversed absent an abuse of discretion amounting to a denial of justice. *Walker v. State*, 2020 Ark. App. 559.

We first point out that the original instruction the court gave the jury was indeed incorrect, and Baker does not argue otherwise. Arkansas Code Annotated section 5-4-401(a)(1) (Repl. 2013) provides that for a defendant convicted of a Class Y felony, the sentence shall be not less than ten years and not more than forty years, or life. Arkansas Code Annotated section 5-4-201 sets out which offenses are subject to a punishment of a fine, and this statute does not provide the option for a fine for a Class Y felony.

We are not persuaded that Baker can demonstrate the prejudice necessary to warrant a mistrial. Although defense counsel did have to recalibrate his closing argument, it was nonetheless effective: counsel asked for the minimum sentence possible, and the jury obliged him with a ten-year sentence, which is the minimum available for a Class Y felony. Moreover, as the State notes, even if the jury had retired to deliberate with the erroneous

instruction and returned a sentence of a fine only on the Y felony, the circuit court would have had to correct it under Arkansas Code Annotated section 16-90-107(d) (Repl. 2016):

> If the jury in any case assesses a punishment, whether of fine or imprisonment, below the limit prescribed by law for offenses of which the defendant is convicted, the court *shall* render judgment and pronounce sentence according to the lowest limit prescribed by law in such cases.

(Emphasis added.) *See also Adams v. State*, 25 Ark. App. 212, 755 S.W.2d 579 (1988) (finding no error when the circuit court imposed the minimum prison sentence after the jury applied an erroneous sentencing instruction and sentenced defendant to only a fine). We find no error in the court's denial of a continuance applying the same reasoning.

Because Baker cannot demonstrate prejudice from the circuit court's denial of his mistrial and continuance motions, he is not entitled to reversal, and we therefore affirm.

Affirmed.

HARRISON, C.J., and MURPHY, J., agree.

*Tapp Law Firm, P.A.*, by: *Tylar C.M. Tapp III*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.