Cite as 2021 Ark. App. 165

# ARKANSAS COURT OF APPEALS

DIVISION IV

**No.** CR-20-582

| | |
|---|---|
| CARLTON LEVON BROWN<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered:** April 14, 2021<br><br>APPEAL FROM THE ASHLEY COUNTY CIRCUIT COURT<br>[NO. 02CR-19-266]<br><br>HONORABLE SAM POPE, JUDGE<br><br>AFFIRMED |

## PHILLIP T. WHITEAKER, Judge

Appellant Carlton Brown was convicted by an Ashley County jury of rape and third-degree battery and sentenced to ten years in the Arkansas Department of Correction.[1] On appeal, Brown argues that the circuit court erred in denying his motion for directed verdict; specifically, he contends that there was insufficient evidence to prove the "forcible compulsion" element of the crime of rape.[2] We affirm.

In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 214. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Camp v. State*, 2011 Ark.

---

[1]Brown was charged by amended information with one count of rape and one count of second-degree battery.

[2]Brown does not appeal his conviction for third-degree battery.

155, 381 S.W.3d 11. On appeal, we review the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Milner v. State*, 2020 Ark. App. 546.

A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion. Ark. Code Ann. § 5-14-103(a)(1) (Repl. 2013). "Forcible compulsion" means physical force or a threat, express or implied, or death or physical injury to or kidnapping of any person. Ark. Code Ann. § 5-14-101(2) (Repl. 2013). The supreme court has defined the term "physical force" as any bodily impact, restraint or confinement, or the threat thereof. *Ellis v. State*, 364 Ark. 538, 222 S.W.3d 192 (2006). Forcible compulsion is not measured by the quantum of force that is applied but rather on whether the act is consummated against the victim's will. *Hillman v. State*, 2019 Ark. App. 89, 569 S.W.3d 372; *Goodman v. State*, 2009 Ark. App. 262, 306 S.W.3d 443.

We now turn our attention to the evidence presented by the State at trial. The victim in this case, M.J., and Brown were acquainted before the incident leading to Brown's conviction. On the day of the incident, M.J. had been at work. At the end of her workday, she went by a friend's house to pick up some beer. As she left her friend's house, she encountered Brown. Brown asked if she would like to drink a beer, and she agreed. Brown suggested they go sit and drink in his car to avoid the mosquitos.

Shortly after getting into the car, Brown looked at M.J. with a "cold, dark stare in his face." M.J. attempted to open the passenger-side door, but the door latch was broken, and she was unable to open the door. M.J. asked Brown to let her out of the car. He refused saying, "Oh, no, I'm not letting you out of this car." He then told her, "No, we're going

to have some sex." When M.J. refused, Brown attacked her. He put his forearm under her neck and was able to remove her pants, climb on top of her, and penetrate her.

Throughout the attack, M.J. fought back, scratching, biting, and kicking Brown and gouging at his eyes. Brown then hit M.J. on the left side of her head with a heavy object contained in a drawstring bag. Eventually, M.J. got her hands on the drawstring bag and was able to tell that it contained a pistol. When she attempted to get her finger on the trigger to shoot Brown, he jumped on her, bit her thumb, and was able to pull the gun from M.J.'s hand. He then leapt from the car and ran behind a nearby house.

M.J., who had been stripped of her pants, underwear, shoes, and wig, ran to another house across the street, but the occupant refused to help her. She then ran home, put on some pants and a wig, and went to the police department. After contacting law enforcement, M.J. was taken to the hospital. Officer Teresa Tolliver of the Crossett Police Department interviewed M.J. at the hospital and took photographs of her injuries, which included bruises and knots around her eyes, marks on her lips from where she had been hit in the mouth, bruises on her arms, and multiple bite marks. The hospital also performed a rape kit and took swabs of M.J.'s many cuts and abrasions. Swabs from M.J.'s vaginal area produced some male DNA but not a sufficient amount to identify an individual. Swabs from a bite mark on her shoulder, however, produced DNA that matched Brown's profile.

After speaking with M.J., Tolliver went to the location of the incident, where she found Brown's 2005 Monte Carlo. Tolliver also found the leggings M.J. had been wearing, along with her underwear, wig, and purse; men's pants and shoes; an empty gun case; and

multiple bloodstains inside and outside of the car. Tolliver then had the car impounded and taken to the police department.

The following morning, Brown presented himself to the Crossett Police Department where Tolliver interviewed him. Brown initially told Tolliver that he encountered M.J. sitting in the passenger seat of his car, uninvited. Brown reported that M.J. was naked from the waist down and had her feet on the dashboard. Brown said that he also noticed that his phone and computer were gone, so he asked M.J. where they were. She denied knowing anything about them, so Brown grabbed her by the feet and dragged her out of the car. Brown claimed that she scratched his face as he did so. He denied biting M.J. or having sex with her. He did give law enforcement permission to photograph his multiple injuries and search his car. Even though Brown was not under physical arrest and was free to leave, he remained at the police station while his car was being searched.

After the search, Brown voluntarily gave another statement. In this second statement, he again initially denied that he had sex with M.J. He did, however, report that M.J. told him that she was "there to spend the evening" with him and "suggest[ed] herself" to him. When confronted with the fact that the evidence would reflect that they did have sex, he changed his story. He then said they "began the course of sex" and admitted having penetrated her. He insisted that the sex was consensual but was interrupted when he discovered items missing from his car. At this point, he admitted that things "turn[ed] foul" and they began fighting. He stated that the fight was not because she didn't want to have sex but because he thought she had stolen from him.

With this evidence, the State rested, and Brown moved for a directed verdict, which was denied by the circuit court. After this denial, Brown testified. According to his testimony, Brown saw M.J. at the house of a relative where they had both stopped to pick up some beer. As Brown left the house, M.J. said she was going with him, and they walked out of the house within minutes of each other. M.J. then approached him and offered to "sell [him] some pussy." They walked to his car, where she got in first and undressed; then Brown got in and they began to "engage in a sexual act." He denied that there was any arguing or fighting until he looked down and saw that she was "quick-handing" his wallet. Brown demanded his money back, and she then began fighting him. He claimed that she hit him so hard two of his teeth were knocked out; as a result, he passed out and fell on her shoulder, which he said caused the bite marks there. He then pulled her out of the car but saw that she had grabbed a bag that contained money. Brown demanded that she give the bag back and then snatched it out of her hand. He acknowledged that his testimony was different from the statement he gave to the police, but he claimed he did not "want to disclose the business that she and [he] had conducted on that particular night." At the conclusion of all the evidence, Brown renewed his motion for a directed verdict, which was again denied.

On appeal, Brown argues that the State's evidence failed to show that he engaged in sexual intercourse with M.J. by forcible compulsion. He cites his own testimony that he engaged in consensual sex with M.J. in exchange for money, and he argues that any exercise of physical force was committed after the act of intercourse in the course of trying to gain his possessions back from her. He acknowledges that the State introduced evidence of M.J.'s

5

physical injuries, but he contends that there was "no evidence presented by the State supporting [the victim's] allegation of rape, other than her statement of such."

Our courts, however, have continually and consistently held that the uncorroborated testimony of a rape victim describing penetration is enough for a conviction. *Lindsey v. State*, 2017 Ark. App. 675, at 5, 536 S.W.3d 163, 166; *Europe v. State*, 2015 Ark. App. 460, 468 S.W.3d 792; *Williams v. State*, 2011 Ark. App. 675, 386 S.W.3d 609. Moreover, the jury has the sole authority to evaluate the credibility of evidence and to apportion the weight to be given to the evidence. *Hillman*, *supra*; *Starling v. State*, 2016 Ark. 20, 480 S.W.3d 158.

M.J.'s testimony, which the jury clearly believed, was that Brown told her they were going to have sex, and when she said no, he pinned her to the passenger seat of his car; when she fought back and became twisted upside down in the seat, Brown removed her pants and penetrated her. Her testimony alone was therefore sufficient to support Brown's conviction for rape by forcible compulsion. In addition, however, her testimony was also corroborated by the photographic evidence of both her injuries and Brown's injuries, which substantiated her claims that they fought violently in the car. And as the State notes, the jury was free to consider and evaluate Brown's inconsistent statements to the police and his trial testimony as evidence of consciousness of guilt. *See, e.g.*, *Bailey v. State*, 2021 Ark. App. 38, 615 S.W.3d 763 (lying to police about one's involvement in a crime can be considered evidence of consciousness of guilt). Brown's arguments on appeal amount to little more than a request that this court reweigh the evidence, which we will not do. *See Gervais v. State*, 2018 Ark. App. 161, 544 S.W.3d 590.

Accordingly, we find no merit to Brown's argument that there was insufficient evidence of forcible compulsion, and we affirm his conviction.

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*Potts Law Office*, by: *Gary W. Potts*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.