Cite as 2023 Ark. App. 473

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-22-814

|  |  |
|---|---|
|  | **Opinion Delivered** October 25, 2023 |
| MATTHEW DAVID KIMERY | APPEAL FROM THE FAULKNER |
| APPELLANT | COUNTY CIRCUIT COURT |
|  | [NO. 23CR-18-810] |
| V. |  |
|  | HONORABLE H. G. FOSTER, |
|  | JUDGE |
| STATE OF ARKANSAS |  |
| APPELLEE | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Matthew David Kimery was convicted by a Faulkner County Circuit Court jury of the offenses of rape and domestic battery in the third degree.[1] He was sentenced to thirty-five years' imprisonment for rape and one year for third-degree domestic battery, with the sentences to run concurrently. On appeal, Kimery argues that the circuit court erred in denying his directed-verdict motions for rape, asserting there was insufficient evidence to support the verdict; specifically, he contends there was insufficient evidence to prove the "forcible compulsion" element of the crime of rape.[2] He further argues that the circuit court

---

[1]Kimery was also charged with false imprisonment; that charge was nolle prossed prior to trial.

[2]Kimery does not contest the sufficiency of the evidence supporting his conviction for third-degree domestic battering on appeal.

erred by improperly excluding evidence of prior sexual conduct under the rape-shield statute. We affirm the convictions.

A motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Curtis v. State*, 2023 Ark. App. 216, 663 S.W.3d 441. In reviewing a sufficiency challenge, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* A conviction will be affirmed if substantial evidence exists to support it; substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Baker v. State*, 2019 Ark. App. 515, 588 S.W.3d 844. Whether evidence excludes every other hypothesis is left to the jury to decide. *Id.* The credibility of witnesses and the weight of the evidence are matters for the finder of fact to decide, and this court may not reweigh the evidence or substitute its own credibility determinations for those of the finder of fact. *Baker v. State*, 2022 Ark. App. 391, 654 S.W.3d 63. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion. Ark. Code Ann. § 5-14-103(a)(1) (Supp. 2021). "Deviate sexual activity" is defined as "any act of sexual gratification involving the penetration, however slight, of the anus or mouth of a person by the penis of another person;

2

or the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person." Ark. Code Ann. § 5-14-101(1)(A) & (B) (Supp. 2021). "Forcible compulsion" is defined, in pertinent part, as "physical force." Ark. Code Ann. § 5-14-101(3). "Physical force" is any bodily impact, restraint, or confinement or the threat thereof; the test used to determine whether physical force was used is whether the act was against the will of the party upon whom the act was committed; forcible compulsion does not depend on the quantum of force applied but rather on whether the act is consummated against the victim's will. *Hillman v. State*, 2019 Ark. App. 89, 569 S.W.3d 372.

Kimery's victim was his wife, AK. The parties married on January 8, 2018, separated in June 2018, and divorced in May 2019. At trial, AK testified that on June 9, while she and Kimery were lying in bed, her stepmother texted her pictures of her children that she then forwarded to her ex-husband, the children's father. Kimery became upset when he saw that AK had texted her ex-husband, telling her that it was disrespectful to text her ex-husband while she was in bed with him. According to AK, they then began to argue about Kimery's watching porn on his phone; Kimery then got on top of her, pinned her down with his arm, and would not get off her, even though she asked several times. AK sloshed coffee from the cup she was holding in her hand onto Kimery, who punched her, rolled her over, handcuffed her, and proceeded to penetrate her with his fingers. On June 16, she made a report to the Faulkner County Sheriff's Office about the June 9 incident, stating that Kimery had hit her, had handcuffed her, and had inserted his fingers into her vagina. AK said that she was

3

initially hesitant to approach officers because Kimery was a former law enforcement officer; he had told her that his "blue brothers" would take his side no matter what she said; and she was afraid of him because he had told her that if she went to the police, he would hurt her.

Initially unbeknownst to AK, Kimery had videoed parts of the sexual encounter on his phone; she was able to copy the video from Kimery's phone, and she showed it to the officers. She explained that the video showed her and Kimery in their bedroom; that Kimery had her in handcuffs; he was slapping her butt, groping her breasts, and pulling her hair, telling her that she "like[d] it rough"; that he was inserting his fingers into her; and that she was begging him to stop because he was hurting her, but he would not stop. AK testified that she did not consent to being handcuffed, being punched in the eye, having Kimery grope her body, or having him insert his fingers into her vagina—nothing on the video was consensual. AK testified that she remained in the home after June 9 out of fear that Kimery's behavior would become more violent if she attempted to leave; she finally left on June 16, the day she made her report to the sheriff's office.

On cross-examination, AK admitted that in the week before she moved out, Kimery was gone from the house for periods of time for work; she was in contact with family and friends; she took Kimery out to dinner and purchased a Father's Day gift and a birthday gift for him; and she even stayed with a friend during that week. She also admitted that she had sex with Kimery after the June 9 incident that she said was consensual, and she sent him a nude photo of her on June 16. AK denied that she and Kimery were role-playing at the time of the June 9 sexual encounter, and she testified that she did not recall if she had asked

4

Kimery to video it. She admitted that she continued to communicate with Kimery after his arrest, sending him e-mails, and telling him that she loved him. On redirect, she testified that Kimery had asked her to send him nude photos of her after June 9; although she said that she did not want to, she sent the photos because she did not know how he would react if she did not send them.

Kimery testified in his own defense. He claimed that on the day in question, AK was texting her ex-husband from her son's room; they had argued; he had apologized to her; and he had told her that he was tired from working long hours at his job as a security officer, and all he wanted to do was to have makeup sex and go to sleep. He said AK got up, did not say anything to him, walked to their bedroom, and got into bed; he took those actions to mean that she was consenting to have sex with him. He said AK would tell him that she just wanted him to f*ck her instead of fighting with her, and she told him that she liked to make him "work for it." He also said that AK had told him that she would rather him make a video of them than for him to watch pornography. He said that he went to the kitchen and retrieved his handcuffs, and when he returned to the bedroom, AK was still in the same position in the bed; he told her to put her hands behind her back, which she did, and he handcuffed her. He claimed that he told her that he was going to make a video with his phone, and she did not object. Kimery testified that he believed AK's telling him to stop was "a feigned resistance" and not sincere; that he stopped when she told him that he was hurting her; and that she told him he could not be that rough with her until she got wet. Kimery said that AK was not crying or upset; she was just talking to him in a normal tone of

voice. He said she never objected to the use of the handcuffs or to his videoing the sexual encounter, and even though she said no, he did not believe it was sincere. Kimery stated that he and AK had sex on several occasions after the June 9 incident, and she sent him nude pictures of her.

On cross-examination, Kimery admitted that he placed AK in handcuffs on June 9, and while she was handcuffed, he penetrated her vagina. Although he admitted that it was clear on the video that she is saying no, stop, and you are hurting me, he claimed that there had been other times she had said this and it was a very feigned, passive resistance. He admitted that the handcuffs were not AK's idea, and she never told him that she wanted to have sex, but when she got into the bed, he took that as consent. Kimery testified that AK never objected to the sex; he asserted there was no force involved in the sexual encounter; and he stated that even though she was saying no, he did not believe she was really saying no.

In his sufficiency argument, Kimery concedes that he penetrated AK's vagina with his fingers while she was handcuffed. However, he argues on appeal, as he did in his motions for directed verdict, that no forcible compulsion was involved. He said that he believed that AK's telling him no and to stop was just feigned resistance as part of their sexual preferences, and he did not believe she sincerely meant no until she told him that he was hurting her, at which point he stopped immediately. Kimery asserts that because he and AK continued to communicate after the June 9 sexual encounter, she sent him nude photos of herself, and

6

they continued to have sexual relations, that proved the June 9 sexual interaction was consensual and without the use of forcible compulsion. We disagree.

Our courts have continually and consistently held that the uncorroborated testimony of a rape victim describing penetration is enough to sustain a conviction. *Brown v. State*, 2021 Ark. App. 165. Witness credibility is an issue for the jury, and the appellate court will not second-guess the determinations of the trier of fact. *Shelton v. State*, 2017 Ark. App. 195, 517 S.W.3d 461. Here, the testimony of Kimery and the testimony of AK are diametrically opposed on the issue of whether the sexual interaction was consensual. AK testified that none of it—the use of handcuffs, the groping of her body, or the penetration of her vagina with his fingers, all while she was telling him no and to stop—was consensual. Kimery testified that his and AK's prior sexual encounters led him to believe that AK's protestations were feigned and insincere. Forcible compulsion depends on whether the act was consummated against the victim's will, *Hillman*, *supra*. AK clearly testified that the June 9 sexual encounter was against her will, and it is clear that the jury credited AK's version of events over Kimery's version, which it is entitled to do as the finder of fact. AK's testimony, if believed, proved that Kimery penetrated her vagina with his fingers against her will, thus establishing the element of forcible compulsion. There is sufficient evidence to support Kimery's rape conviction, and we affirm on this point.

For his second point on appeal, Kimery argues that the circuit court erred by improperly excluding evidence of prior sexual conduct under the rape-shield statute.[3] We disagree and affirm.

The Arkansas rape-shield statute, found at Arkansas Code Annotated section 16-42-101 (Supp. 2023), provides, in pertinent part:

> (b) In a criminal prosecution under § 5-14-101 et seq., except for a misdemeanor violation of sexual indecency with a child, § 5-14-110, the Human Trafficking Act of 2013, § 5-18-101 et seq., or § 5-26-202, or for criminal attempt to commit, criminal solicitation to commit, or criminal conspiracy to commit an offense defined in any of those sections, opinion evidence, reputation evidence, or evidence of specific instances of the victim's prior sexual conduct with the defendant or any other person, evidence of a victim's prior allegations of sexual conduct with the defendant or any other person, evidence of a person's prior sexual conduct when the person was a victim of human trafficking, which allegations the victim asserts to be true, or evidence offered by the defendant concerning prior allegations of sexual conduct by the victim with the defendant or any other person if the victim denies making the allegations is not admissible by the defendant, either through direct examination of any defense witness or through cross-examination of the victim or other prosecution witness, to attack the credibility of the victim, to prove consent or any other defense, or for any other purpose.
>
> (c) Notwithstanding the prohibition contained in subsection (b) of this section, evidence directly pertaining to the act upon which the prosecution is based or evidence of the victim's prior sexual conduct with the defendant or any other person may be admitted at the trial if the relevancy of the evidence is determined in the following manner:
>
> > (1) A written motion shall be filed by the defendant with the court at any time prior to the time the defense rests stating that the defendant has an offer of relevant evidence prohibited by subsection (b) of this section and the purpose for which the evidence is believed relevant;

---

[3]The State failed to respond to this argument in its brief.

(2)(A) A hearing on the motion shall be held in camera no later than three (3) days before the trial is scheduled to begin, or at such later time as the court may for good cause permit.

(B) A written record shall be made of the in camera hearing and shall be furnished to the Supreme Court on appeal.

(C) If, following the hearing, the court determines that the offered proof is relevant to a fact in issue, and that its probative value outweighs its inflammatory or prejudicial nature, the court shall make a written order stating what evidence, if any, may be introduced by the defendant and the nature of the questions to be permitted in accordance with the applicable rules of evidence; and

(3)(A) If the court determines that some or all of the offered proof is relevant to a fact in issue, the victim shall be told of the court's order and given the opportunity to consult in private with the prosecuting attorney.

On August 19, 2019, Kimery filed a written motion for an in camera hearing regarding AK's prior sexual conduct with him. He asserted that they were married, and their previous sexual conduct was relevant to the res gestae of the case. A hearing was held on November 21; the circuit court entered an order on December 10 finding that Kimery would be allowed to ask AK if they had engaged in consensual sexual intercourse during the course of their six-month marriage, but he would not be allowed to ask whether they had engaged in prior sexual-bondage conduct, finding that "the anticipated uncorroborated testimony related to prior bondage during the marriage is not relevant to a fact in issue," was prejudicial and inflammatory, and outweighed any probative value.

On November 24, 2020, Kimery moved by written motion for reconsideration of that ruling, arguing that the prior sexual conduct between him and AK was relevant to the res gestae of the case; that the prior sexual conduct was relevant and essential to his defense of

9

consent; and that even if AK did not consent to this particular sexual act, his belief that she did, in fact, consent was reasonable based on their prior sexual conduct. AK testified at the January 12, 2021, hearing on that motion that bondage was not the normal sexual relations she and Kimery had; she identified three occasions of that type of sexual relations in their marriage—once in which Kimery forced her to wear an orange prisoner shirt, and she was shackled and handcuffed while they had sex; another occasion in which he penetrated her with a dildo; and the occasion that was the subject of the rape prosecution. The circuit court entered an order on January 21 affirming its earlier ruling that Kimery would be allowed to introduce evidence that he and AK had a prior sexual relationship, but any specifics about bondage, handcuffing, or other specific forms of sexual interaction would be prohibited as highly prejudicial and not probative of any legitimate aspect of Kimery's defense. The circuit court determined that the evidence Kimery sought to have introduced did not make it more or less likely that on June 9, 2018, he engaged in intercourse or deviant sexual activity against the wishes and over the objections and resistance of AK.

The purpose of the rape-shield statute is to shield victims of rape or sexual abuse from the humiliation of having their sexual conduct, unrelated to the pending charges, paraded before the jury and the public when such conduct is irrelevant to the defendant's guilt. *State v. Cossio*, 2017 Ark. 297, 529 S.W.3d 620. The circuit court is vested with a great deal of discretion in determining whether evidence is relevant, and we will not reverse the circuit court's decision as to the admissibility of rape-shield evidence unless its ruling constitutes clear error or a manifest abuse of discretion. *Id.*

Kimery, citing *Herren v. State*, 2018 Ark. App. 528, 563 S.W.3d 606, argues that the fact that he and AK previously had participated in consensual bondage and rape role-play was part of the res gestae because it was directly related to the pending charges and was extremely relevant and probative to the issue of consent. We disagree.

The res gestae of a criminal offense is described as

circumstances so nearly related to the main fact under consideration as to illustrate its character and the state of mind, sentiment and disposition of the actor are parts of the *res gestae*, which embraces not only the actual facts of the transaction and the circumstances surrounding it, but also matters immediately antecedent to and having a direct causal connection with it, as well as acts immediately following it and so closely connected with it as to form in reality part of the occurrence.

*Herren*, 2018 Ark. App. 528, at 5, 563 S.W.3d at 609 (quoting *Cossio*, 2017 Ark. 297, at 5, 529 S.W.3d at 623). Although evidence of other crimes by the accused is generally not admissible, under the res gestae exception, all the circumstances connected with a particular crime may be shown to put the jury in possession of the entire transaction, and where separate incidents constitute one continuing criminal episode or are intermingled with the crime actually charged, the evidence is admissible. *Cossio, supra.*

*Herren* is easily distinguishable from the present case. In that case, Herren digitally penetrated the vagina of one of his stepdaughter's sixteen-year-old friends after smoking marijuana and taking shots with her. Herren sought to have evidence introduced that, prior to the digital penetration, the victim was asking him for sex, masturbating in front of him, offering him oral sex, attempting to undo his shorts, and touching his penis through his shorts. The circuit court excluded this evidence, finding it was not relevant and was

11

prohibited under the rape-shield statute. Herren was convicted of rape. On appeal, he argued the evidence was improperly excluded. This court agreed with Herren, holding that the excluded evidence was res gestae because it was alleged sexual activity that occurred between the same parties on the same night as the charged conduct and only a short time before the penetration, and excluding such evidence was clearly erroneous because the conduct was related to the pending charges and was thus relevant and probative to the issue of consent.

We hold that this case is more akin to *Cossio*. In that case, Cossio was charged with rape, and the circuit court allowed into evidence testimony of sexual conduct (a lap dance) between the victim and a female friend of Cossio's that occurred the night before the rape as part of the res gestae of the case. The State brought an interlocutory appeal, arguing that such evidence was not relevant to the offense as charged and was more prejudicial than probative. The supreme court agreed with Cossio's argument, holding that the victim's sexual conduct the night before the rape was not relevant and was thus inadmissible under the rape-shield statute to show the res gestae of the charged offense since it involved a third party, not Cossio; that the two nights did not make up a continuing sequence of events; and that the victim's prior sexual conduct on the night before the rape was not intermingled or contemporaneous with the rape.

Although in the present case the sexual conduct was between the same parties, the prior sexual conduct Kimery sought to have introduced into evidence was even more remote in time than one day from the June 9 allegation of rape; under the *Cossio* holding, the

12

previous sexual conduct cannot constitute the res gestae of the rape offense.  Unlike the conduct in *Herren*, the conduct here did not occur minutes before the rape.  Kimery wants to point to prior sexual conduct in the marriage to argue that he acted in conformity on the night of the rape, believing that he had consent to handcuff and digitally penetrate AK.  The circuit court did not abuse its discretion in refusing to allow Kimery to ask about specific prior instances of sexual conduct between him and AK because it was not relevant to the question of whether there was forcible compulsion in the June 9 sexual encounter, and it was highly prejudicial and not probative.

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*The Hudson Law Firm, PLLC*, by: *Grace Casteel*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.